## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-10358 |
| | § | |
| WC 5th AND WALLER, LLC, | § | |
| | § | CHAPTER 11 |
| Debtor | § | |

## MOTION TO DISMISS BANKRUPTCY CASE
## PURSUANT TO 11 U.S.C. §1112

TO THE HONORABLE UNITED STATES BANKRPTCY JUDGE:

COMES NOW, 501 Waller Lender, LLC ("Movant"), the sole secured creditor in the above captioned and numbered bankruptcy case (the "Bankruptcy Case"), to file this Motion to Dismiss Bankruptcy Case Pursuant to 11 U.S.C. §1112 ("Motion to Dismiss"), and would respectfully show the Court as follows:

### I. JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core proceeding as defined in 28 U.S.C. §157(b)(1).

### II. BACKGROUND AND PROCEDURAL HISTORY

2.      On or about September 19, 2017, WC 5th and Waller, LLC ("Debtor"), the debtor in the Bankruptcy Case, executed a promissory note (the "Note") in the original principal sum of $6,640,000.00 payable to the order of First National Bank of Beeville. A true and correct copy of the Note is attached hereto as Exhibit A and incorporated herein by reference for all purposes.

3.      Payment of the Note is secured by a lien granted in a deed of trust (the "Deed of Trust") executed by Debtor on or about September 19, 2017, duly recorded as Document No. 2017150851, Official Public Records, Travis County, Texas, and covering the following described real property (the "Real Property"):

> Lots 7, 8, 9, 10, 11 and 12, Block 4, Outlot 3, Division A, in the City of Austin, Travis County, Texas, according to the map or plat recorded in Volume1, Page 8, Plat Records of Travis County, Texas.

A true and correct copy of the Deed of Trust is attached hereto as Exhibit B and incorporated herein by reference for all purposes.

4.      The Note and Deed of Trust lien were transferred to Movant by Transfer of Note and Lien executed to be effective February 11, 2020, duly recorded as Document No. 2020025670, Official Public Records, Travis County, Texas.  A true and correct copy of the Transfer of Note and Lien is attached hereto as Exhibit C and incorporated herein by reference for all purposes.

5.      Debtor subsequently defaulted under the terms of the Note and Deed of Trust and other documents executed in connection therewith.

6.      On April 13, 2021, Movant posted the Real Property for foreclosure by Notice of Foreclosure duly recorded as Document No. 202140107, Official Public Records, Travis County, Texas.  A true and correct copy of the Notice of Foreclosure is attached hereto as Exhibit D and incorporated herein by reference for all purposes.  Pursuant to the Notice of Foreclosure, a foreclosure sale of the Real Property was scheduled for May 4, 2021.

7.      The Bankruptcy Case was initiated by the filing of a voluntary chapter 11 petition on May 4, 2021, literally minutes before a non-judicial foreclosure sale was set to

begin.  Indeed, the Bankruptcy case was filed at 9:57 a.m. on Tuesday, May 4, 2021, just three minutes before the foreclosure sale was scheduled

### III.  LEGAL AUTHORITIES

#### A.  Dismissal for Bad Faith Filing

8.     Pursuant to §1112(b) of the Bankruptcy Code, on the request of a party in interest, a court shall convert a case to one under Chapter 7 "or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  11 U.S.C.§1112(b)(1).   While the Bankruptcy Code does not define "cause," Section 1112(b)(4) provides a non-exhaustive list of examples of "cause" that support dismissal or conversion, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" 11 U.S.C. §1112(b)(4)(A).  Filing a bankruptcy petition in bad faith is one of the non-enumerated bases for dismissing a case. "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *In re Little Creek Dev. Co.,* 779 F. 2d 1068, 1071 (5th Cir. 1986) (citations omitted); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 817 (5th Cir. 1991) (following *Little Creek*).

9.      "The good faith standard protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *Matter of Elmwood Dev.*, 964 F.2d 508, 510 (5th

Cir. 1992). "[G]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose." *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000) (quoting *In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970). Importantly, because bankruptcy provides debtors with "powerful equitable weapons," the Fifth Circuit recognizes the critical gatekeeping function that the good faith standard serves to protect the "jurisdictional integrity of the bankruptcy courts" by limiting its access only to those debtors and creditors "with clean hands." *Little Creek*, 779 F.2d at 1072.

10. As courts of equity, bankruptcy courts are "enabled to frustrate fraud and work complete justice." *Pipkins-Thomas v. United States*, 223 Fed. Appx. 310, 313 (5th Cir. 2007) (*quoting Tex. Co. v. Miller*, 165 F.2d 111, 116 (5th Cir. 1947)). To safeguard and prevent abuse, they are empowered with a variety of tools, including Section 105(a)'s broad statutory power and expansive authority to dismiss an action *sua sponte* when filed in bad faith. *See In re Art Midwest, Inc.*, No. 04-91225-RFN-11, 2006 WL 306894, at *3 (Bankr. N.D. Tex. Jan. 5, 2006) (noting the Fifth Circuit in *Little Creek* "instructed bankruptcy courts to be vigilant for those cases where the rehabilitative purposes of chapter 11 will not be served," in such cases courts are duty bound to dismiss, and holding that even if the parties seeking dismissal had no standing, the court, pursuant to section 105(a) may *sua sponte* dismiss a bankruptcy case filed in bad faith.") (citation omitted).

11. Courts evaluate the "totality of the circumstances" to determine whether a debtor demonstrates the requisite good faith to access the privileges and equitable powers of bankruptcy. *See, e.g. Cedar Shore*, 235 F.3d at 379 (*citing Little*

*Creek*, 779 F.2d at 1072). The Fifth Circuit instructs bankruptcy courts on how to analyze the facts and circumstances to properly exercise its equitable powers and discretion to protect the bankruptcy system from a debtor's abuse:

> The good faith determination depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. A collation of factors, rather than any single datum, controls resolution of this issue. In determining whether a petition was filed with the requisite good faith, the court must examine the facts and circumstances germane to each particular case.

*Elmwood Dev.*, 964 F.2d at 510.

12.     While a specific bad-faith test has not been established, courts have identified certain factors that necessitate the dismissal of a particular case as a bad-faith filing. These factors include, but are not limited to, whether:

a)     The bankruptcy estate is composed of one asset (which is often a single tract of real property);

b)     The secured creditor's liens encumber the tract of real property;

c)     There are typically no employees other than the principals of the debtor;

d)     The debtor has little or no cash flow;

e)     No available sources of income are available to sustain a reorganization plan;

f)     Few, if any, unsecured creditors exist (and whose claims are relatively small);

g)     The property has been scheduled for foreclosure due to lack of debt payments;

h)     Bankruptcy was filed as the last option to prevent loss of the property; and

i)     Allegations are made of wrongdoing by the debtor or its principals.

See *Little Creek*, 779 F.2d at 1073. Satisfaction of each factor is not necessary to establish bad faith. Instead, when the "conglomerate" of such is met, dismissal is appropriate, as "[r]esort[ing] to the protection of the bankruptcy laws is not proper" when "there is no hope of rehabilitation...." Id.; see, also, C-TC 9th Avenue Partnership v. Norton Co., 113 F.3d 1304 (2d Cir. 1997) (dismissing chapter 11 bankruptcy proceeding because debtor never had any intention of reorganizing).

13.     Applying the *Little Creek* factors in the instant case: the bankruptcy estate is composed of only one asset, being the Real Property; Movant's liens encumber the Real Property; Debtor has not yet filed its Schedules and Statement of Financial Affairs, but on information and belief, there are no employees of Debtor, other than perhaps the single principal of the Debtor; on information and belief, Debtor has no cash flow; on information and belief, Debtor has no available sources of income to sustain a reorganization plan; according to the List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Doc#2), there are only 5 general unsecured creditors with total unsecured debt of only $22,331.95, which is *di minimis* when compared to the total amount owed to Movant; the Real Property was scheduled to be foreclosed on the very day the Bankruptcy Case was filed for lack of debt payments; and the Bankruptcy Case was filed as the last option to prevent loss of the Real Property.

14.     In fact, the only one of the bad faith factors enumerated in *Little Creek* which might not apply is the last factor, which is allegations made of wrongdoing by the debtor or its principals. But, in this regard, Movant would note that the petition initiating this case was filed by Natin Paul, "authorized agent." World Class Holdings V, LLC is the sole member and manager of Debtor. Natin Paul is the President of World Class Holdings V, LLC. See Exhibit E, attached hereto and incorporated herein by reference for all purposes. On February 8, 2021, as was recently well publicized in the local press, Natin Paul was found to have used certain of his businesses for the purpose of perpetrating fraud upon, among others, The Roy F. and Joann Cole Mitte Foundation (the "***Mitte Foundation***"), primarily for the benefit of Natin Paul. An arbitration award in favor of the Mitte Foundation against Natin Paul and others, jointly and severally, was

made in the amount of $1,909,125.20, plus attorneys' fees, costs of court, and pre-and post-judgment interest.

15.     It is important to note that the lack of intent to act in bad faith does not necessarily result in retention of an alleged bad-faith filing. In fact, the enumerated grounds for dismissing a bankruptcy case resemble certain bad-faith factors without a requisite level of intent. See 11 U.S.C. §1112(b).

16.     In attacking the Debtor's good faith in filing, Movant must establish a prima facie case, after which the Debtor has the burden of proving that the petition was filed in good faith." *In re Sherwood Enterprises*, *Inc*., 112 B.R. 165, 170–71 (Bankr. S.D. Tex. 1989). Further, if the debtor intends to rely on the prohibition to dismissal or conversion provided in §1112(b)(2), the Court must find and specifically identify unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditor and the estate, and in addition, the debtor or any other party in interest must establish that there is a reasonable likelihood that a plan will be confirmed within a reasonable time and the "cause" for dismissal or conversion is something other than a continuing loss or diminution of the estate under § 1112(b)(4)(A) for which there is reasonable justification for the act or omission and that will be cured within a reasonable time fixed by the Court.  *In re Delta Ag Grp*., *LLC*, 596 B.R. 186, 197 (Bankr. W.D. La. 2019) (citing 11 U.S.C. §§1112 (b)(2)(A)-(B)). With regard to whether there is a reasonable likelihood that a plan will be confirmed within a reasonable time, Movant notes that Natin Paul, as President of various entities, has authorized the filing of no less than 25 bankruptcy cases (including this Bankruptcy Case) which are currently pending in the United States Bankruptcy Court, Western District of Texas, Austin Division,

including 4 cases filed in 2019 and 16 cases filed in 2020. Only one of these bankruptcy cases has a confirmed plan of reorganization and that plan was consensual. There have been no plans confirmed over the objection of the secured creditor.

17. This Bankruptcy Case is a single asset real estate ("SARE") case. Legislative history is devoid of any suggestion that SARE debtors are somehow exempt from the good faith requirement.

**B. Dismissal for Cause Other Than Bad Faith.**

18. Even without a finding of bad faith, a bankruptcy court may dismiss a case for "cause", if it is in the best interest of the creditors and the estate." See *In re Primestone Investment Partners L.P.*, 272 B.R. 554, 555 (D. Del. 2002). In fact, once a court determines that "there is an absence of a reasonable likelihood of rehabilitation" or that a "debtor is suffering continuing losses without the prospect for reorganization," dismissal is appropriate pursuant to §1112(b)(1). See *In re Abijoe Realty Corp.*, 943 F.2d 121 (1st Cir.1991); see, also, *In re Lumber Exchange Building L.P.*, 968 F.2d 647 (8th Cir. 1992). As noted above, Natin Paul, as President of various entities, has authorized the filing of no less than 25 bankruptcy cases (including this Bankruptcy Case) which are currently pending in the United States Bankruptcy Court, Western District of Texas, Austin Division, including 4 cases filed in 2019 and 16 cases filed in 2020, none of which has a plan of reorganization which has been confirmed over the objection of the secured creditor.

WHEREFORE, PREMISES CONSIDERED, Movant respectfully prays that the Court enter an order dismissing the Bankruptcy Case and for such other and further relief to which it may show itself justly entitled, both general and special, legal and equitable.

Respectfully submitted,

C. DANIEL ROBERTS, P.C.
1602 E. Cesar Chavez
Austin, Texas 78702
Telephone: (512) 494-8448
Facsimile: (512) 494-8712

By: _/s/ C. Daniel Roberts_
      C. Daniel Roberts
      Texas Bar No.: 16999200
      droberts@cdrlaw.net

ATTORNEY FOR 501 WALLER
LENDER LLC

## CERTIFICATE OF SERVICE

By my signature above, I, C. Daniel Roberts, hereby certify that on May 17, 2021 a true and correct copy of the foregoing document was served upon the following parties and the parties listed on the attached matrix via electronic means as listed on the Court's ECF noticing system or by regular first-class mail, postage prepaid.

| | |
|---|---|
| WC 5th and Waller, LLC | Mark H. Ralston |
| 814 Lavaca Street | 13155 Noel Road, Suite 700 |
| Austin, Texas 78701 | Dallas, Texas 75240 |
| DEBTOR | ATTORNEY FOR DEBTOR |
| | |
| | United States Trustee |
| | 615 E. Houston, Suite 533 |
| | Austin, Texas 78701 |

```
Label Matrix for local noticing        WC 5th and Waller, LLC              U.S. BANKRUPTCY COURT
0542-1                                  814 Lavaca Street                  903 SAN JACINTO, SUITE 322
Case 21-10358-tmd                       Austin, TX 78701-2316              AUSTIN, TX 78701-2450
Western District of Texas
Austin
Mon May 17 08:37:00 CDT 2021

501 Waller Lender LLC                   501 Waller Lender, LLC             Alliance Tax Advisors
c/o C. Daniel Roberts                   A. Lee Rigby                       433 E Las Colinas Blvd
C. Daniel Roberts, PC                   3500 Jefferson Street, Suite 330   Irving, Texas 75039-5581
1602 East Cesar Chavez                  Austin, Texas 78731-6323
Austin, Texas 78702-4456

City of Austin                          Geary Porter and Donovan PC        Manfred Sternberg & Associates PC
PO Box 2267                             PO Box 700248                      1700 Post Oak Blvd
Austin, Texas 78783-2267                Dallas, TX 75370-0248              Houston, Texas 77056-3973

Office of the US Trustee                Travis County                      United States Trustee - AU12
903 San Jacinto Boulevard              c/o Jason A. Starks                United States Trustee
Room 230                                P.O. Box 1748                      903 San Jacinto Blvd, Suite 230
Austin, TX 78701-2450                   Austin, TX 78767-1748              Austin, TX 78701-2450

Waterloo Surveyors, Inc.                Mark H. Ralston                    End of Label Matrix
PO Box 160176                           13155 Noel Road                    Mailable recipients    13
Austin, Texas 78716-0176                Suite 700                          Bypassed recipients     0
                                        Dallas, TX 75240-5030              Total                  13
```

# Exhibit A

The First National Bank of Beeville NMLS#410989
Kent Fry NMLS ID#616737

# PROMISSORY NOTE

### DEFINED TERMS

DATE:              September 19, 2017

BORROWER:   **WC 5TH AND WALLER, LLC**
                        401 Congress Avenue, Floor 33
                        Austin, Travis County, Texas 78701-3792

LENDER:          **THE FIRST NATIONAL BANK OF BEEVILLE**
                        1400 E. Houston Street
                        Beeville, Bee County, Texas 78102

PRINCIPAL AMOUNT:   **SIX MILLION SIX HUNDRED FORTY THOUSAND AND
                                        NO/100 DOLLARS** ($6,640,000.00)

NOTE RATE:

The initial Note Rate will be four and three-fourths percent (4.75%) per year.  The Note Rate may change daily.  Each date on which the interest rate could change is a "Change Date."

Beginning with the first Change Date, the Note Rate will be based on an index, which is the annual rate of interest identified as the "U.S. prime rate" in the "Money Rates" column published in the *Wall Street Journal*.  If the published prime is expressed on the applicable date as a range, the prime rate for purposes of this Note will be the highest of that range (the "Current Index Rate").  If the *Wall Street Journal* ceases to publish a prime rate, Lender may refer to another similar source to identify the prime rate on corporate loans at large U.S. money center commercial banks and apply that rate.

Before each Change Date, the new Note Rate will be calculated by adding one-half of one percentage points (0.50%) (the "Margin Percentage") to the Current Index Rate.  Subject to the limits stated below, the new Note Rate will be the applicable Note Rate until the next Change Date.

The amount of the monthly payment that would be sufficient to pay in full the Principal Amount remaining on the Change Date by the Maturity Date at the new Note Rate, in substantially equal payments, will be calculated and will be the new amount of the monthly payment.  Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

The new Note Rate will become effective on each Change Date. The new monthly payment will be paid from the first monthly payment date after the Change Date until the amount of the monthly payment changes again.

---

**Promissory Note**            Page  1  of 7            Borrower's Initials:

THE CURRENT INDEX RATE IS USED AS A DEVICE TO SET THE RATE OF INTEREST ONLY; IN NO EVENT IS IT TO BE CONSTRUED AS A WARRANTY OR REPRESENTATION OF FAVORABILITY OR RATE OR A REPRESENTATION THAT LOANS WILL NOT BE MADE AT LOWER RATES.  THE CURRENT INDEX RATE IS FOUR AND ONE-FOURTH PERCENT (4.25%), OF WHICH BORROWER WAS INFORMED AT THE DATE ON WHICH THE NOTE RATE WAS DETERMINED.

The Note Rate will never be more than the Default Interest Rate (as hereinafter defined); provided, however, that in no event shall the interest rate herein exceed the Maximum Lawful Rate (as hereinafter defined).

PAYMENT TERMS:

1. <u>Payment Terms</u>.  Principal and interest are payable in monthly installments of **FORTY-THREE THOUSAND ONE HUNDRED FIFTY-SEVEN AND 56/100 DOLLARS** ($43,157.56) each, beginning October 19, 2017, and continuing regularly and monthly thereafter until September 19, 2037 ("Maturity Date"), when the entire amount hereof, principal and interest then remaining unpaid, shall be then due and payable; interest being calculated on the unpaid principal to the date of each installment paid and the payment made credited first to the discharge of the interest accrued and the balance to the reduction of the principal.  Lender may, at its option:  (i) refuse a tender of partial payment; (ii) require payment in cash, cash equivalent, or guaranteed form; and (iii) require each payment be limited to one instrument.

2. <u>Application of Payment</u>.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs.  I will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.  All payments must be made in U.S. dollars and must be received by Lender consistent with any written payment instructions provided by Lender.  If a payment is made consistent with Lender's payment instructions but received after 4:00 p.m. Central Time, Lender will credit the payment on the next business day.

3. <u>Payment Adjustments</u>.  Notwithstanding the Payment Terms recited herein, on each Change Date of this Note, Lender may, at its option, and on Borrower's written request Lender agrees to, adjust the payment terms to reflect an amortization of the indebtedness at the Note Rate, based upon the amortization scheduled at the inception of this Note, such that equal installments of the adjusted payment amount will, at the Note Rate on such Change Date, cause the entire indebtedness to be extinguished on the original Maturity Date.  The adjusted payment terms shall be effective from the date of the first payment following the Change Date.  Lender shall notify Borrower of such adjustment, in writing, at the last known address of Borrower, according to the records of Lender.

4. <u>Prepayment</u>.  Borrower shall have the right to prepay this Note, in whole or in part, on the payment dates, without penalty or premium, so long as any partial prepayments are in increments of $100.00.  Partial prepayments will be credited on the next installment due date.

5. <u>Returned Check Charge</u>.  In the event a check offered in full or partial payment on this Note is returned unpaid for any reason other than Lender's sole negligence, Lender may charge a fee for the purpose of defraying the expense incident to handling such returned check, and Borrower agrees to pay such fee.  The fee will not exceed the maximum amount permitted under applicable law, and will become a part of the Note debt until paid.

6.     <u>Late Charge</u>. If any portion or all of an installment becomes overdue for more than ten (10) days, a late charge equal to five percent (5.00%) of the entire installment amount shall accrue, in order to defray the expense of handling the delinquent payment. This provision does not in any way affect Lender's right to require strict performance hereon.

7.     <u>Disclosure</u>. THIS LOAN IS PAYABLE IN FULL AT MATURITY. AT MATURITY YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

AGREEMENT:

1.     <u>Promise to Pay</u>. For value received, the Borrower (whether one or more) promises to pay to the order of Lender the Principal Amount, together with interest on the unpaid balance of such amount, in lawful money of the United States of America, according to the Payment Terms and all other terms, conditions and covenants of this Note and the Loan Documents.

2.     <u>Right of Setoff</u>. Borrower grants to Lender a contractual possessory security interest in, and hereby transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender, including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however all IRS and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender during the existence of an Event of Default and to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such accounts.

3.     <u>Interest Provisions</u>.

    (a) <u>Rate</u>. The principal balance of this Note from time to time remaining unpaid prior to maturity will bear interest at a fluctuating rate per annum (the "<u>Note Rate</u>") that is equal to the "<u>Current Index Rate</u>" plus the "<u>Margin Percentage</u>", but never greater than the "<u>Maximum Lawful Rate</u>", as those terms are defined in this Note. Borrower acknowledges that the Current Index Rate is known to and readily ascertainable by Borrower. Regardless of the term that may be used from time to time to describe such Current Index Rate (such as "base rate" or "prime rate"), such interest rate does not necessarily mean the lowest interest rate charged to other borrowers. Borrower acknowledges that the fluctuations of the Current Index Rate may not necessarily correspond with future increases or decreases in interest rates charged by other lenders or market interest rates in general. The Margin Percentage is added to the Current Index Rate to establish the Note Rate. Each date on which the interest rate could change is called a "<u>Change Date</u>". Any change in the Note Rate resulting from a change in the level of the Current Index Rate is effective without notice to Borrower on the same date as the change in the Current Index Rate.

    (b) <u>Maximum Lawful Interest</u>. The term "<u>Maximum Lawful Rate</u>" means the maximum rate of interest and the term "<u>Maximum Lawful Amount</u>" means the maximum amount of interest that are permissible under applicable state or federal law for the type of loan evidenced by this Note and the other Loan Documents. If Article 1.04 of the Texas Credit Code is applicable to this Note, and applicable state or federal law does not permit a higher interest rate, the "<u>Indicated (Weekly) Ceiling</u>" (as defined as Article 1.04(a)(1) of the Texas Credit Code) will be the Interest Rate Ceiling applicable to this Note and will be

---

**Promissory Note**                 **Page 3 of 7**                 **Borrower's Initials:**

the basis for determining the Maximum Lawful Rate in effect from time to time during the term of this Note, unless a different Interest Rate Ceiling is designated above. If applicable state or federal law allows a higher interest rate or federal law preempts the state law limiting the rate of interest, then the foregoing Interest Rate Ceiling will not be applicable to this Note. If the Maximum Lawful Rate is increased by statute or other governmental action subsequent to the date of this Note, then the new Maximum Lawful Rate will be applicable to this Note from the effective date thereof, unless otherwise prohibited by applicable law.

(c) <u>Spreading of Interest</u>. Because of the possibility of, among other things, prepayment, the total interest that will accrue under this Note cannot be determined in advance. Lender does not intend to contract for, charge or receive more than the Maximum Lawful Rate or Maximum Lawful Amount permitted by applicable state or federal law, and to prevent such an occurrence Lender and Borrower agree that all amounts of interest, whenever contracted for, charged or received by Lender, with respect to the loan of money evidenced by this Note, are to be spread, prorated or allocated over the full period of time this Note is unpaid, including the period of any renewal or extension of this Note. If demand for payment of this Note is made by Lender prior to the full stated term, the total amount of interest contracted for, charged or received to the time of such demand is to be spread, prorated or allocated along with any interest thereafter accruing over the full period of time that this Note thereafter remains unpaid for the purpose of determining if such interest exceeds the Maximum Lawful Amount.

(d) <u>Excess Interest</u>. At maturity (whether by acceleration or otherwise) or on earlier final payment of this Note, Lender will compute the total amount of interest that has been contracted for, charged or received by Lender or payable by Borrower under this Note and compare such amounts to the Maximum Lawful Amount that could have been contracted for, charged or received by Lender. If the computation reflects that the total amount of interest contracted for, charged or received by Lender or payable by Borrower exceeds the Maximum Lawful Amount, then Lender will apply such excess to the reduction of the principal balance and not to the payment of interest; or if such excess interest exceeds the unpaid principal balance, such excess will be refunded to Borrower. This provision concerning the crediting or refund of excess interest will control and take precedence over all other agreements between Borrower and Lender so that under no circumstances will the total interest contracted for, charged or received by Lender exceed the Maximum Lawful Amount.

(e) <u>Interest After Default</u>. At Lender's option, the unpaid principal balance, and accrued and unpaid interest capitalized thereon, will bear interest after maturity (whether by acceleration or otherwise) at the "<u>Default Interest Rate</u>". The Default Interest Rate will be, at Lender's option, the lesser of (i) the Maximum Lawful Rate, if such Maximum Lawful Rate is established by applicable law; or (ii) the Note Rate plus five (5) percentage points, if no Maximum Lawful Rate is established by applicable law; but never more than the Maximum Lawful Rate or at a rate that would cause the total interest contracted for, charged or received by Lender to exceed the Maximum Lawful Amount.

(f) <u>Daily Computation of Interest</u>. Interest will be calculated on the basis of the actual number of days elapsed over a year composed of 360 days. In no event will Lender compute the interest in a manner that would cause Lender to contract for, charge or receive interest that would exceed the Maximum Lawful Rate or the Maximum Lawful Amount.

4. <u>Default Provisions</u>.

(a) <u>Events of Default and Acceleration of Maturity</u>. Lender may, without notice or demand (except as otherwise required by statute or otherwise specifically provided in this Note), accelerate the maturity of this Note and declare the entire unpaid principal balance and accrued interest at once due and payable if: (i) There is default in the payment of any installment of principal, interest or any other sum required to be paid under the terms of this Note or any of the Loan Documents; or (ii) there is default in the perfor-

mance of any covenant, condition, or agreement contained in this Note or any of the Loan Documents, including any instrument securing the payment of this Note or any loan agreement relating to the advance of loan proceeds. Lender may, at its election, refuse to accept a tender in partial cure of default.

(b)  Notice of Default.  Notwithstanding anything to the contrary, Lender agrees to give notice (the "Notice of Default") to Borrower in writing of any default, and if the same be not cured within ten (10) days as regards any monetary default and within thirty (30) days as regards any non-monetary default from the date of such Notice of Default, then without further notice, presentment, demand of any kind, either: (a) acceleration of maturity hereof may be imposed if the maturity of this Note has not been accelerated; or (b) if the maturity of this Note has been accelerated and the default is cured as required by the Notice of Default, then the acceleration will be rescinded and the installment provisions of the Note will be reinstated. The Notice of Default will be deemed to be delivered, whether actually received or not, when deposited in the United States mail, postage fully prepaid, certified mail, and addressed to the intended recipient at the last known address according to the records of the holder delivering the notice. Notice given in any other manner will be effective only if and when received by the addressee.

(c)  Waiver By Borrower.  BORROWER AND ALL OTHER PARTIES LIABLE FOR THIS NOTE WAIVE DEMAND, NOTICE OF INTENT TO DEMAND, PRESENTMENT FOR PAYMENT, NOTICE OF NONPAYMENT, PROTEST, NOTICE OF PROTEST, GRACE, NOTICE OF DISHONOR, NOTICE OF INTENT TO ACCELERATE MATURITY, NOTICE OF ACCELERATION OF MATURITY, AND DILIGENCE IN COLLECTION. EACH BORROWER, SURETY, ENDORSER, AND GUARANTOR OF THIS NOTE AGREES TO ONE OR MORE EXTENSIONS FOR ANY PERIOD OF TIME, AND ANY PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, WITHOUT PREJUDICE TO THE HOLDER OF THIS NOTE. EACH BORROWER, SURETY, ENDORSER, AND GUARANTOR WAIVES NOTICE OF ANY AND ALL RENEWALS, EXTENSIONS, AND MODIFICATIONS OF THIS NOTE.

(d)  Non-Waiver by Lender.  Any previous extension of time, forbearance, failure to pursue some remedy, acceptance of late payments, or acceptance of partial payment by Lender, before or after maturity, does not constitute a waiver by Lender of its later right to strictly enforce the collection of this Note according to its terms.

(e)  Other Remedies Not Required.  Borrower may be required to pay this Note in full without the assistance of any other party, or any collateral or security for this Note. Lender will not be required to mitigate damages, file suit, or take any action to foreclose, proceed against or exhaust any collateral or security in order to enforce payment of this Note.

(f)  Joint and Several Liability.  Each Borrower who signs this Note, and all of the other parties liable for the payment of this Note, such as guarantors, endorsers, and sureties, are jointly and severally liable for the payment of this Note.

(g)  Attorney's Fees.  If Lender obtains the services of an attorney to enforce the payment of this Note or the performance of the other Loan Documents, or if this Note is collected through any lawsuit, probate, bankruptcy, or other judicial proceeding, Borrower agrees to pay to Lender all reasonable attorney's fees and expenses, court costs, and other collection costs incurred by Lender. This provision is limited by any applicable statutory restrictions relating to the collection of attorney's fees.

5.  General Provisions.

(a)  Subsequent Holder.  All references to Lender in this Note also refer to any subsequent owner or holder of this Note by transfer, assignment, endorsement or otherwise, any successor or assign of Lender, or any entity or person entitled to receive payments under this Note.

(b) <u>Transfer</u>. Borrower acknowledges and agrees that Lender may transfer this Note or partial interests in the Note to one or more transferees or participants. Borrower authorizes Lender to disseminate any information it has pertaining to the loan evidenced by this Note, including, without limitation, credit information on Borrower and any guarantor of this Note, to any such transferee or participant or prospective transferee or participant, in each case subject to commercially reasonable terms of confidentiality.

(c) <u>Other Parties Liable</u>. All promises, waivers, agreements and conditions applicable to Borrower are likewise applicable to and binding upon any other parties primarily or secondarily liable for the payment of this Note, including all guarantors, endorsers and sureties.

(d) <u>Modifications</u>. Any modifications agreed to by Lender relating to the release of liability of any of the parties primarily or secondarily liable for the payment of this Note, or relating to the release, substitution, or subordination of all or part of the security for this Note, in no way constitute a release of liability with respect to the other parties or security not covered by such modification.

(e) <u>Entire Agreement</u>. Borrower warrants and represents that the Loan Documents constitute the entire agreement between Borrower and Lender with respect to the Loan evidenced by this Note and agrees that no modification, amendment or additional agreement with respect to such Loan or the advancement of funds thereunder will be valid and enforceable unless made in writing signed by both Borrower and Lender.

(f) <u>Chapter 15 Not Applicable</u>. It is understood that Chapter 15 of the Texas Credit Code relating to certain revolving credit loan accounts and tri-party accounts is not applicable to this Note.

(g) <u>Governing Law</u>. THIS NOTE HAS BEEN EXECUTED AND DELIVERED IN TEXAS, AND IS TO BE CONSTRUED IN ACCORDANCE WITH THE APPLICABLE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES OF AMERICA APPLICABLE TO TRANSACTIONS IN TEXAS.

6.    Miscellaneous Provisions.

(a) <u>Attorney's Fees</u>. If either party retains an attorney to enforce this Note, the prevailing party is entitled to recover reasonable attorney's fees and related expenses.

(b) <u>Binding Effect</u>. This Note shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, successors and assigns where permitted by this Note.

(c) <u>Counterparts</u>. This Note may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts are to be construed together and constitute one and the same instrument, and the signature pages may be removed from the counterparts and combined on one instrument for recording or convenience.

(d) <u>Effect of Waiver or Consent</u>. No waiver or consent, express or implied, by any party to or of any breach or default by any party in the performance by such party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such party of the same or any other obligations of such party hereunder. Failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder until the applicable statute of limitation period has run.

(e) <u>Further Assurances</u>. In connection with this Note as well as all transactions contemplated by this Note, each signatory party hereto agrees to execute and deliver such additional documents and instru-

ments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Note and all such transactions.

(f)  Legal Construction.  In case any one or more of the provisions contained in this Note shall for any reason be invalid, illegal or unenforceable in any respect, to the extent such invalidity or unenforceability does not destroy the basis of the bargain among the parties, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  Whenever required by the context, as used in this Note, the singular number shall include the plural and the neuter shall include the masculine or feminine gender, and vice versa.  The Article and Section headings appearing in this Note are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section.  This Note shall not be construed more or less favorably between the parties by reason of authorship or origin of language.

(g)  Notices.  Any notice or communication required or permitted hereunder shall be deemed to be delivered, whether actually received or not, when deposited in the United States mail, postage fully prepaid, registered or certified mail, and addressed to the intended recipient at the address shown herein, and if not so shown, then at the last known address according to the records of the party delivering the notice.  Notice given in any other manner shall be effective only if and when received by the addressee.  Any address for notice may be changed by written notice delivered as provided herein.

(h)  Recitals.  Any recitals in this Note are represented by the parties hereto to be accurate, and constitute a part of the substantive agreement.

(i)  Time.  Time is of the essence.  Unless otherwise specified, all references to "days" shall mean and refer to calendar days.  Business days shall exclude all Saturdays, Sundays, and Texas legal banking holidays.  In the event the date for performance of any obligation hereunder shall fall on a Saturday, Sunday or Texas legal banking holiday, then that obligation shall be performable on the next following regular business day.

7.    Electronic Archive Disclosure. By signing below, Borrower hereby gives express consent to the electronic storage and maintenance of all documents pertaining to this loan transaction. Lender agrees to provide at Borrower's request and expense a printed copy of the documents pertaining to this transaction. Borrower agrees that the electronic record shall serve as an exact duplicate and legal substitute for all original documents thereby represented.

BORROWER:

WC 5TH AND WALLER, LLC

By: _____
        Natin Paul, President

# Exhibit B

ELECTRONICALLY RECORDED 2017150851
TRV 24 PGS

The First National Bank of Beeville NMLS#410989
Kent Fry NMLS ID#616737

#50 COI 17.288148-Am

**NOTICE OF CONFIDENTIALITY RIGHTS:** if you are a natural person, you may remove or strike any of the following information from this instrument before it is filed for record in the public records: your social security number or your driver's license number.

# DEED OF TRUST
### (Including Security Agreement)
(Recording in Real Property Records Constitutes Fixture Filing)

DATE:  September 19, 2017

GRANTOR:  **WC 5TH AND WALLER, LLC**
401 Congress Avenue, Floor 33
Austin, Travis County, Texas 78701-3792

LENDER:  **THE FIRST NATIONAL BANK OF BEEVILLE**
1400 E. Houston Street
Beeville, Bee County, Texas 78102

TRUSTEE:  **KENT FRY**
c/o The First National Bank of Beeville
1400 E. Houston Street
Beeville, Bee County, Texas 78102

NOTE: Promissory Note dated of even date herewith, in the original principal amount of $6,640,000.00, executed by Grantor and payable to Lender, payable as stated in the Note with a final maturity date of September 12, 2037.

LAND: Lots 7, 8, 9, 10, 11 and 12, Block 4, OUTLOT 3, DIVISION A, in the City of Austin, Travis County, Texas, according to the map or plat recorded in Volume 1, Page 8, Plat Records of Travis County, Texas.

LOAN DOCUMENTS:  The documents creating, governing, evidencing and/or securing the indebtedness represented by this Note are collectively referred to as the "Loan Documents", the amounts owing thereunder are referred to as the "Debt", and the transaction creating the Debt and represented by the Loan Documents is referred to as the "Loan".

This combined Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement ("Instrument") is made among the Grantor, Lender and Trustee. Grantor agrees to the terms and conditions and makes the covenants stated in this Instrument.

---

**Deed of Trust**                                                        **Page 1 of 24**

## ARTICLE I - SECURITY

1.01. <u>Conveyance in Trust</u>. For value received, the receipt and sufficiency of which Grantor acknowledges, and to secure the payment of the Debt and performance of the covenants and agreements of Grantor stated in the Loan Documents, Grantor conveys the Property to the Trustee in trust, with power of sale, TO HAVE AND TO HOLD the Property, together with the rights, privileges and appurtenances thereto belonging unto the Trustee and the Trustee's substitutes or successors forever. Grantor binds Grantor and Grantor's heirs, successors and assigns to WARRANT AND FOREVER DEFEND the Property unto the Trustee, and the Trustee's substitutes or successors and assigns, against the claim or claims of all persons claiming or to claim the same or any part thereof.

1.02. <u>Purpose of Loan/Purchase Money</u>. Grantor represents that the Debt, the payment of which is secured hereby, is in part payment of the purchase price of the Property herein described, and is secured by a vendor's lien and superior title whether or not specifically retained in the Deed of even date herewith to the undersigned, and this Instrument is given as additional security for the payment of said Debt.

1.03. <u>Property</u>. The Property covered by this Instrument includes the following:

(a) The Land, together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining thereto, and all of the estate, right, title, interest, claim and demand whatsoever of Grantor therein or thereto, either at law or in equity, in possession or in expectancy, now owned or hereafter acquired;

(b) All structures, buildings and improvements of every kind and description now or at any time hereafter located or placed on the Land (the "Improvements");

(c) All easements, rights of way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, and other entitlements now or hereafter located on the Land or under or above the same or any part or parcel thereof, and all estates, rights, titles, interests, tenements, hereditaments and appurtenances, reversions and remainders whatsoever, in any way belonging, relating or appertaining to the Property or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Grantor;

(d) All furniture, furnishings, fixtures, goods, equipment, or personal property owned by Grantor and now or hereafter located on, attached to or used in or about the Improvements, including, but not limited to, all machines, engines, boilers, dynamos, elevators, stokers, tanks, cabinets, awnings, screens, shades, blinds, carpets, draperies, lawn mowers, and all appliances, plumbing, heating, air conditioning, lighting, ventilating, refrigerating, disposals and incinerating equipment, and all fixtures and appurtenances thereto, and such other goods and chattels and personal property owned by Grantor as are now or hereafter used or furnished in operating the Improvements, or the activities conducted therein, and all building materials and equipment hereafter situated on or about the Land or Improvements, and all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (exclusive of any of the foregoing owned or leased by tenants of space in the Improvements);

(e) All water, water courses, ditches, wells, reservoirs and drains and all water, ditch, well, reservoir and drainage rights and powers which are appurtenant to, located on, under or above or used in connection with the Land or the Improvements, or any part thereof, together with (i) all utilities, utility lines, utility commitments, utility capacity, capital recovery charges, impact fees and other fees paid in connection with same, (ii) reimbursements or other rights pertaining to utility or utility services provided to the Land and/or Improvements and (iii) the present or future use or availability of waste water capacity, or other utility facilities to the extent same pertain to or ben-

efit the Land and/or Improvements, including, without limitation, all reservations of or commitments or letters covering any such use in the future, whether now existing or hereafter created or acquired;

(f) All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Land;

(g) All cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Lender pursuant to this Deed of Trust or any other of the Loan Documents;

(h) All leases, licenses, tenancies, concessions and occupancy agreements of the Land or the Improvements now or hereafter entered into and all rents, royalties, issues, profits, bonus money, revenue, income, rights and other benefits (collectively, the "Rents" or "Rents and Profits") of the Land or the Improvements, or the fixtures or equipment, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future lease (including, without limitation, oil, gas and mineral leases), license, tenancy, concession, occupancy agreement or other agreement pertaining thereto or arising from any of the Contracts (as hereinafter defined) or any of the General Intangibles (as hereinafter defined) and all cash or securities (the "Security Deposits") to secure performance by the tenants, lessees or licensees, as applicable, of their obligations under any such leases, licenses, concessions or occupancy agreements, whether said cash or securities are to be held until the expiration of the terms of said leases, licenses, concessions or occupancy agreements or applied to one or more of the installments of rent coming due prior to the expiration of said terms;

(i) All contracts and agreements now or hereafter entered into covering any part of the Land or the Improvements (collectively, the "Contracts") and all revenue, income and other benefits thereof, including, without limitation, management agreements, service contracts, maintenance contracts, equipment leases, personal property leases and any contracts or documents relating to construction on any part of the Land or the Improvements (including plans, specifications, studies, drawings, surveys, tests, operating and other reports, bonds and governmental approvals) or to the management or operation of any part of the Land or the Improvements;

(j) All present and future monetary deposits given to any public or private utility with respect to utility services furnished to any part of the Land or the Improvements;

(k) All present and future funds, accounts, instruments (including, without limitation, promissory notes), investment property, letter of credit rights, letters of credit, money, supporting obligations, accounts receivable, documents, causes of action, claims, general intangibles (including, without limitation, payment intangibles and software, trademarks, trade names, service marks and symbols now or hereafter used in connection with any part of the Land or the Improvements, all names by which the Land or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Grantor has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Land or the Improvements) and all notes or chattel paper (whether tangible or electronic) now or hereafter arising from or by virtue of any transactions related to the Land or the Improvements and all rebates and refunds of real estate taxes and assessments (and any other governmental impositions related to the Property or the operations conducted or to be conducted on the Property) (collectively, the "General Intangibles");

(l) All water taps, sewer taps, certificates of occupancy, permits, special permits, uses, licenses, franchises, certificates, consents, approvals and other rights and privileges now or hereafter obtained in connection with the Land or the Improvements and all present and future warranties and guaranties relating to the Improvements or to any equipment, fixtures, furniture, furnish-

ings, personal property or components of any of the foregoing now or hereafter located or installed on the Land or the Improvements;

(m) All building materials, supplies and equipment now or hereafter placed on the Land or in the Improvements and all architectural renderings, models, drawings, plans, specifications, studies and data now or hereafter relating to the Land or the Improvements;

(n) All right, title and interest of Grantor in any insurance policies or binders now or hereafter relating to the Property, including any unearned premiums thereon;

(o) All proceeds, products, substitutions and accessions (including claims and demands therefor) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards; and

(p) All other or greater rights and interests of every nature in the Land or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Grantor.

1.04.  Subrogation.  Any of the proceeds of the Note utilized to take up any outstanding liens against all or any part of the Property have been advanced by Lender at Grantor's request and upon Grantor's representation that such amounts are due and are secured by valid liens against the Property.  Lender will be subrogated to any and all rights, powers, superior titles, liens, and equities owned or claimed by any owner or holder of any outstanding liens and debts, however remote, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

## ARTICLE II - DEBT AND PAYMENTS

2.01.  Debt.  The Debt secured by this Instrument will mean and include the following:

(a)  Loan Documents.  Any and all sums becoming due and payable pursuant to the Loan Documents;

(b)  Advancements.  Any and all other sums becoming due and payable by Grantor (or any one or more of them, if more than one) to Lender as a result of advancements made by Lender pursuant to the terms and conditions of any Loan Documents;

(c)  Other Debt.  The conveyance made by this Instrument, in addition to being made to secure payment of the Note, is also made in trust to secure and enforce the payment of all other indebtedness and obligations of Grantor, or any one or more of them, to Lender, whether presently existing, or in any manner or means hereafter incurred by Grantor, or any one or more of them, and evidenced in any manner whatsoever, either by notes, advances, overdrafts, bookkeeping entries, guaranty agreements, liens or security interest instruments, or any other method or means including any renewal and extension of the Note, or of any part of any present or future indebtedness, or other obligations, of Grantor, or any one or more of them (collectively the "Other Debt").  The fact of repayment of all indebtedness, and performance of all other obligations, of Grantor, to Lender will not terminate the lien arising hereunder unless the same be released by Lender at the request of Grantor; but otherwise it will remain in full force and effect to secure all Other Debt regardless of any additional security that may be taken as to it.  In no event will this conveyance secure payment of any installment loan or any open-end line of credit established under Chapter 3, Chapter 4, or Chapter 15 of the Texas Credit Code (Vernon's Texas Civil Statutes Art. 5069-3.01 et seq.); and

(d)  Renewals.  Any and all renewals, substitutions or modifications of the Debt, of any part of the Debt.

---

**Deed of Trust**                                                                                     Page 4 of 24

2.02. Other Loan Documents. In addition to this Instrument and the Note, Grantor and Lender may execute various other documents and agreements relating to the Debt secured by this Instrument. This Instrument will also secure the performance of all obligations and covenants of Grantor under the Loan Documents.

2.03. Payment of Principal and Interest. Grantor will promptly pay when due the principal of and interest on the Debt. Lender may, at its option, require payment in cash, cash equivalent, or guaranteed funds.

2.04. Application of Payments. Unless applicable law or this Instrument provide otherwise, all payments received by Lender from Grantor under the Loan Documents will be applied by Lender in the following order of priority: (a) amounts payable to Lender by Grantor under the Loan Documents other than the Note, in such order as Lender, at Lender's option, may determine; and (b) sums payable to Lender under the Note, to be applied to principal or interest as Lender may determine in its discretion. In the event any portion of the Debt cannot be lawfully secured hereby, payments in reduction thereof will be applied first to those portions not secured hereby.

2.05. Guarantor. The term "Guarantor" will include any person or entity obligated to pay or guaranteeing payment or collection of all or any portion of the Debt, directly or indirectly.

## ARTICLE III - SECURITY AGREEMENT

3.01. Uniform Commercial Code Security Agreement. This Instrument is also intended to be a security agreement between Grantor, as debtor, and Lender, as secured party, pursuant to the Texas Uniform Commercial Code [Texas Business and Commerce Code §1.01 et seq. ("Texas UCC")] for any of the Property which, under applicable law, may be subject to a security interest pursuant to the Texas UCC, and Grantor hereby grants to Lender a security interest in that part of the Property ("Collateral"). Grantor agrees that Lender may file this Instrument, or a copy of it, in the real property records or other appropriate index, as a financing statement for any of the Collateral. Any copy of this Instrument or of any other security agreement or financing statement will be sufficient as a financing statement. In addition, Grantor agrees to execute and deliver to Lender, upon Lender's request any financing statement, as well as extensions, renewals, and amendments thereof, and copy of this Instrument in such form as Lender may require to perfect a security interest with respect to the Collateral. Grantor will pay all costs of filing the financing statement and any extensions, amendments, and releases thereof and will pay all reasonable costs of any record searches for financing statements Lender may reasonably require. Without the prior written consent of Lender, Grantor will not create or suffer to be created pursuant to the Texas UCC any other security interest in the Collateral, including replacements and additions thereto. Upon the occurrence and during the existence of an Event of Default, Lender will have the remedies of a secured party under the Texas UCC and, at Lender's option, may also invoke the remedies provided in the Loan Documents as to the Collateral. In exercising any remedies, Lender may proceed against the items of real property and any items of personal property specified above as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Texas UCC or of the remedies provided in the Loan Documents.

3.02. Notice of Changes. Grantor will give advance notice in writing to Lender of any proposed change in Grantor's name, identity, or structure and will execute and deliver to Lender, prior to or concurrently with the occurrence of any such changes, all additional financing statements that Lender may require to establish and maintain the validity and priority of Lender's security interest with respect to the Collateral.

3.03. Fixtures. Some of the Collateral are goods that are or are to become fixtures related to the Land. Grantor and Lender intend that, as to those goods, this Instrument will be effective as a financing statement filed as a fixture filing from the date of its filing for record in the real estate records of the county in which the Property is situated. Information concerning the security interest created by this Instrument may be obtained

---

**Deed of Trust**                                                                    Page 5 of 24

from Lender, as secured party, at Lender's address stated above.   The mailing address of the Grantor, as debtor, is as stated above.

3.04.   Filing of Financing Statements.   Grantor authorizes Lender to file financing statements and amendments, which have not been signed by Grantor, to the fullest extent allowed by law.

## ARTICLE IV - ASSIGNMENT OF LEASES

4.01.   Assignment of Leases.   Grantor assigns to Lender, and grants to Lender a security interest in, all of Grantor's rights, but not Grantor's obligations, under existing and future leases, including subleases, and any and all extensions, renewals, modifications, and replacements of such leases, upon any part of the Property (the "Leases").   Grantor also assigns to Lender all guaranties of tenants' performance under the Leases.   When no Event of Default exists, Grantor will have the right, without joinder of Lender, to enforce the Leases.

4.02.   Warranties Concerning Leases and Rents.   Grantor represents and warrants that:  (a) Grantor has good title to the Leases hereby assigned and authority to assign them, and no other person or entity has any right, title or interest therein; (b) all existing Leases are valid, unmodified and in full force and effect, except as indicated herein, and no default exists thereunder; (c) unless otherwise provided herein, no Rents or other sums owing under the Leases have been or will be assigned, mortgaged or pledged; (d) no Rents have been or will be anticipated, waived, released, discounted, set off, or compromised; and (e) except as indicated in the Leases, Grantor has not received any funds or deposits from any tenant that has not already been applied to the payment of accrued Rents.

4.03.   Grantor's Covenants of Performance.   Grantor covenants to:  (a) perform all of its obligations under the Leases and give prompt notice to Lender of any failure to do so; (b) give immediate notice to Lender of any notice Grantor receives from any tenant or subtenant under any Leases, specifying any claimed default by any party under such Leases, excluding, however, notice of defaults under residential Leases; (c) enforce the tenants obligations under the Leases; (d) defend, at Grantor's expense, any proceeding pertaining to the Leases, including, if Lender so requests, any such proceeding to which Lender is a party; and (e) neither create nor permit any encumbrance upon Grantor's interest as landlord of the Leases, except this Instrument and any other encumbrances permitted by this Instrument.

4.04.   Prior Approval for Actions Affecting Leases.   Grantor will not, without the prior written consent of Lender:  (a) receive or collect Rents under any lease more than one month in advance; (b) encumber or assign future Rents; (c) waive or release any material obligation of any tenant under the Leases, except in the ordinary course of business; (d) cancel, terminate, or modify any of the Leases, cause, permit, or accept any cancellation, termination, or surrender of any of the Leases, or commence any proceedings for dispossession of any tenant under any of the Leases, except upon default by the tenant thereunder, or except in the ordinary course of business; (e) renew or extend any of the Leases, except pursuant to terms in existing Leases, or except in the ordinary course of business; (f) permit any assignment of the Leases, except in the ordinary course of business; or (g) enter into any Leases after the date hereof, except in the ordinary course of business.

4.05.   Attornment of Tenants.   All new Leases of the Property will specifically provide:  (a) that such Leases are subordinate to this Instrument; (b) that the tenant attorns to Lender, such attornment to be effective upon Lender's acquisition of title to the Property; (c) that the tenant agrees to execute such further evidences of attornment as Lender may from time to time request; (d) that the attornment of the tenant will not be terminated by foreclosure; and (e) that Lender may, at Lender's option, accept or reject such attornments.

4.06.   Settlement for Termination.   Grantor agrees that no settlement for damages for termination of any of the Leases under the Federal Bankruptcy Code, or under any other federal, state, or local statute, will be made without the prior written consent of Lender, and any check in payment of such damages will be made payable to both Grantor and Lender.   Grantor hereby assigns any such payment to Lender, to be applied to the Debt as Lender may elect, and Grantor agrees to endorse any check for such payment to the order of Lender.

---

**Deed of Trust**                                                                                                    Page 6 of 24

4.07.  <u>Lender in Possession</u>.  Lender's acceptance of this assignment will not, prior to entry upon and taking possession of the Property by Lender, be deemed to constitute Lender a "mortgagee in possession," nor obligate Lender to appear in or defend any proceeding relating to any of the Leases or to the Property, take any action hereunder, expend any money, incur any expenses, or perform any obligation or liability under the Leases, or assume any obligation for any deposits delivered to Grantor by any tenant and not delivered to Lender. Lender will not be liable for any injury or damage to person or property in or about the Property.

4.08.  <u>Appointment of Attorney</u>.  Grantor hereby appoints Lender its attorney-in-fact, coupled with an interest, empowering Lender to subordinate any Leases to this Instrument.

4.09.  <u>Indemnification; Hold Harmless of Leases</u>.  **Grantor hereby indemnifies and holds Lender harmless from all liability, damage, or expense incurred by Lender from any claims under the Leases, including without limitation any claims by Grantor with respect to Rents paid directly to Lender after an Event of Default and claims by tenants for security deposits or for rental payments more than one (1) month in advance and not delivered to Lender, including matters arising by reason of Lender's negligence, but not including matters arising from Lender's gross negligence or willful misconduct.  All amounts indemnified against hereunder, including reasonable attorneys' fees, if paid by Lender will bear interest at the Default Interest Rate defined in the Note, will be payable by Grantor immediately without demand, and will be secured by this Instrument.  The foregoing provisions will survive the payment in full of the Debt and the release of this Instrument as to events occurring and causes of action arising before such payment and release.**

4.10.  <u>Records</u>.  Upon request by Lender, Grantor will deliver to Lender executed originals of all Leases and copies of all records relating thereto.

4.11.  <u>Merger</u>.  There will be no merger of the leasehold estate, as created by the Leases, with the fee estate of the Land without the prior written consent of Lender.

4.12.  <u>Right to Rely</u>.  Grantor authorizes and directs the tenants under the Leases to pay Rents to Lender upon written demand by Lender, without further consent of Grantor and regardless of whether Lender has taken possession of any other portion of the Property, and the tenants may rely upon any written statement delivered by Lender to the tenants.  Any such payment to Lender will constitute payment to Grantor under the Leases, and Grantor appoints Lender as Grantor's lawful attorney-in-fact for giving, and is hereby empowered to give, acquittances to any tenants for such payments to Lender after an Event of Default.

## ARTICLE V - ASSIGNMENT OF RENTS

5.01.  <u>Absolute Assignment of Rents</u>.  As part of the consideration for the indebtedness evidenced by the Note, and for other valuable consideration, the receipt and sufficiency of which Grantor acknowledges, Grantor hereby absolutely and unconditionally assigns and transfers to Lender all rents, issues, income, receipts, and profits from the Property, and all security deposits and other security therefor (the "Rents"), including those now due, or to become due by virtue of any Lease or other agreement for the occupancy or use of all or any part of the Property, regardless of to whom the Rents are payable.  Grantor authorizes Lender or Lender's agents to collect the Rents and directs each tenant of the Property to pay such Rents to Lender or Lender's agents; provided, however, that prior to the occurrence of an Event of Default, Grantor will collect and receive all Rents as trustee for the benefit of Lender and Grantor, to apply the Rents so collected to the sums secured by this Instrument in the order provided by the Loan Documents with the balance, so long as no Event of Default then exists, to the account of Grantor.  Grantor and Lender intend that this assignment of Rents constitutes an absolute and present assignment and not an assignment for additional security only.  Grantor and Lender intend that Lender will have the absolute right, power, and authority to collect the Rents.

5.02.  **Event of Default**.  During the existence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining full control of the Property in person, by agent or by a court-appointed receiver, Lender will immediately be entitled to possession of all Rents as the Rents become due and payable, and all such Rents will immediately upon delivery of such notice be held by Grantor as trustee for the benefit of Lender only; provided, however, that the written notice by Lender to Grantor of the breach by Grantor will contain a statement that Lender exercises its rights to such Rents.  Grantor agrees that commencing upon delivery of such written notice of an Event of Default by Lender to Grantor, each tenant of the Property will make such Rents payable to and pay such Rents to Lender or Lender's agents on Lender's written demand to each tenant therefor, delivered to each tenant personally, by mail or by delivering such demand to each rental unit, without any liability on the part of any tenant to inquire further as to the existence of an Event of Default.

5.03.  **Grantor's Covenants**.  Grantor covenants that Grantor has not executed any prior assignment of the Rents or any portion thereof, that Grantor has not performed, and will not perform, any acts and has not executed, and will not execute, any instrument which would prevent Lender from exercising its rights hereunder and that at the time of execution of this Instrument there has been no anticipation or prepayment of any of the Rents for more than thirty days prior to the due dates of such Rents.  Grantor covenants that Grantor will not hereafter collect or accept payment of any Rents more than thirty days prior to the due dates of such Rents without prior written consent of Lender.  Grantor further covenants that Grantor will execute and deliver to Lender such further assignments of Rents as Lender may from time to time request.

5.04.  **Appointment of Receiver; Possession of the Property**.  During the existence of an Event of Default, Lender may in person, by agent or by a court-appointed receiver, regardless of the adequacy of Lender's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof, including without limitation the execution, cancellation or modification of Leases, the collection of Rents, the making of repairs to the Property, and the execution or termination of contracts providing for the management or maintenance of the Property, all on such terms as are deemed best to protect the security of this Instrument.  In the event Lender elects to seek the appointment of a receiver for the Property upon the occurrence of an Event of Default, Grantor consents to the appointment of such receiver.  Lender or the receiver will be entitled to receive a reasonable fee for managing the Property.

5.05.  **Application of Rents**.  All Rents collected subsequent to the occurrence of an Event of Default will be applied first to the costs, if any, of taking control of and managing the Property and collecting the Rents, including without limitation attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the Property, premiums on insurance policies, taxes, assessments, and other charges on the Property, and the costs of discharging any obligation or liability of Grantor as landlord of the Property, and then to the Debt.  Lender or the receiver will have access to the books and records used in the operation and maintenance of the Property and will be liable to account only for those Rents actually received.  Lender will not be liable to Grantor, anyone claiming under or through Grantor, or anyone having an interest in the Property, by reason of anything done or left undone by Lender hereunder.

5.06.  **Insufficient Rents**.  If the Rents are not sufficient to meet the costs, if any, of taking control of and managing the Property and collecting the Rents, any funds expended by Lender for such purposes will become part of the Debt.  Unless Lender and Grantor agree in writing to other terms of payment, such amounts will be payable upon notice from Lender to Grantor requesting payment and will bear interest from the date of disbursement at the rate stated in the Note, unless payment of such interest at such rate would be contrary to applicable law, in which event such amounts will bear interest at the highest non-usurious rate which may be collected from Grantor under applicable law.

5.07.  **No Waiver; Term**.  Any entering upon and taking and maintaining of control of the Property by Lender or the receiver and any application of Rents as provided herein will not cure or waive any default hereunder or invalidate any other right or remedy of Lender under applicable law or the Loan Documents.  This assignment of the Rents will terminate at such time as this Instrument ceases to secure the Debt held by Lender.

---

## ARTICLE VI - REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS

Grantor covenants, warrants, and represents to and agrees with Lender as follows:

6.01. __Payment and Performance__.  Grantor will make all payments on the Debt when due and will punctually and properly perform all of Grantor's covenants, obligations and liabilities under the Loan Documents. Lender may, at its option, require full performance and refuse partial performance by Grantor or on Grantor's behalf.

6.02. __Title to Property and Liens of this Instrument__.  Grantor has good and marketable title to the Property, free and clear of any liens, charges, encumbrances, security interests, and adverse claims whatsoever, except as otherwise provided herein.  If the interest of Lender in any part of the Property is endangered or attacked, directly or indirectly, Grantor authorizes Lender, at Grantor's expense, to take all necessary and proper steps for the defense of such interest, including the employment of attorneys, the performance of title related work, the prosecution or defense of litigation, and the compromise or discharge of claims made against such interest.

6.03  __Lender's Right With Respect to Ad Valorem Taxes__.  Grantor hereby grants Lender a right of first refusal with respect to Grantor's power to authorize any third party (other than Lender pursuant to its rights as set forth in this instrument) to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lender) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lender, within ten days after receiving written notice from Grantor, fails to pay the ad valorem taxes pursuant to Lender's rights as set forth in this instrument.

6.04. __Title Insurance__.  Grantor will, at its sole cost and expense, obtain and maintain mortgagee title insurance (in the form of a commitment, binder, or policy as Lender may require) in form acceptable to Lender in an amount equal to the amount of the Note.

6.05. __Insurance__.

(a)  Grantor will, at Grantor's sole cost and expense, obtain and maintain insurance upon and relating to all insurable Property by all-risk insurance policies and such other coverage as Lender may reasonably require, in amounts equal to their full insurable value unless Lender gives written approval of a smaller amount.

(b)  Grantor will, at its sole cost and expense, obtain and maintain general liability insurance policies covering Grantor, the Property, and the operations on the Property.

(c)  Grantor will deliver the policies of insurance to Lender promptly as issued; and, if Grantor fails to do so, Lender, at its option, may procure such insurance at Grantor's expense.  Lender will have the right to hold the policies, and Grantor will promptly furnish to Lender all renewal notices and all receipts of paid premiums.  All renewal and substitute policies of insurance will be delivered to Lender, premiums paid, at least ten (10) days before termination.

(d)  Grantor will give Lender prompt notice of any damage to the Property.  In case of loss covered by policies of insurance ("Insured Casualty"), Lender (or, after foreclosure, the purchaser at the foreclosure sale) is authorized, at Lender's option either (i) to settle and adjust any claim under such policies without the consent of Grantor; or (ii) allow Grantor to agree with the insurer on the amount to be paid upon the Insured Casualty.  In any case Lender will collect any insurance proceeds.  The expenses incurred by Lender in the adjustment and collection of insurance proceeds will be part of the Debt and will be reimbursed to Lender upon demand.  If the Property can, in the reasonable judgment of Lender, be re-

stored within six (6) months of an Insured Casualty to an economic unit not less valuable than it was prior to the Insured Casualty, then, if no Event of Default has occurred or is then continuing, the proceeds of insurance will be applied to reimburse Grantor for the cost of restoration; provided always, that Grantor pay all costs (and if required by Lender, Grantor will deposit the total thereof with Lender in advance) of restoration in excess of the net proceeds of insurance. Except as provided above, the proceeds of insurance paid on any Insured Casualty will be applied to the payment of the Debt. In the event proceeds of insurance are made available to Grantor for the restoration, Grantor covenants to restore it to be of at least equal value and of substantially the same character as prior to the damage, all to be effected according to applicable laws, building and related codes and ordinances, and plans and specifications approved in advance by Lender.

(e) In the event Grantor is entitled to reimbursement out of insurance proceeds held by Lender, such proceeds will be disbursed from time to time upon Lender being furnished with (i) evidence reasonably satisfactory to it of the estimated cost of completion of the restoration; (ii) funds, or, at Lender's option, assurances sufficient in addition to the proceeds of insurance to complete the proposed restoration; and (iii) such certificates, waivers of lien, sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and the performance which Lender may reasonably require and approve. No payment made prior to the final completion of the restoration may exceed ninety percent (90%) of the value of the work performed from time to time (unless such payment constitutes full and final payment for all labor and materials through completion of the job). Funds other than proceeds of insurance will be disbursed prior to disbursement of insurance proceeds. The undisbursed balance of the proceeds remaining with Lender, together with funds deposited for that purpose must at all times be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the restoration, free and clear of all liens or claims. Any surplus remaining out of the insurance proceeds held by Lender after payment of such costs of restoration, will be paid to Grantor.

(f) If any Insured Casualty occurs at any time when an Event of Default exists, Lender will be entitled to the benefit of all insurance held by or for any Grantor, to the same extent as if it had been made payable to Lender, and upon foreclosure under this Instrument, Lender will become the owner of all insurance policies.

(g) All insurance policies will be issued on forms and by companies satisfactory to Lender. The all-risk insurance policies will have any loss made payable to Lender as mortgagee, and will include standard mortgagee clauses. Each insurance policy will have a provision giving Lender thirty (30) days' prior notice of cancellation or material change of the coverage.

**COLLATERAL PROTECTION INSURANCE NOTICE.**
**In accordance with the provisions of section 307.052(a) of the Texas Finance Code, Lender hereby notifies Grantor as follows:**
**(a)   Grantor is required to:**
      **(i)    keep the collateral insured against damage in the amount Lender specifies;**
      **(ii)   purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**
      **(iii)  name Lender as the person to be paid under the policy in the event of a loss;**
**(b)   Grantor must, if required by Lender, deliver to Lender a copy of the policy and proof of the   payment of premiums; and**
**(c)   if Grantor fails to meet any requirement listed in Paragraph (a) or (b), Lender may obtain collateral protection insurance on behalf of Grantor at Grantor's expense.**

6.06.   <u>Taxes and Assessments</u>.  Grantor will pay all taxes and assessments affecting the Property as they become due and payable, and, upon request by Lender, Grantor will deliver to Lender such evidence of their payment as Lender may require.  If Grantor fails to do so, Lender may pay them, together with all costs and penalties, at Grantor's expense; provided, however, that Grantor may in good faith, in lieu of paying the taxes

and assessments as they become due and payable, by appropriate proceedings, contest their validity. Pending such contest, Grantor will not be deemed in default under this Instrument because of such nonpayment if: (a) prior to delinquency of the asserted tax or assessment, Grantor provides an indemnity bond secured by a deposit in cash or other security acceptable to Lender, or with a surety acceptable to Lender, in the amount of the tax or assessment being contested by Grantor plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed; and (b) Grantor promptly pays any amount adjudged by a  court of competent jurisdiction to be due, on or before the date which is thirty (30) days after such judgment becomes final.  In any event, the tax, assessment, penalties, interest, and costs will be paid prior to the date on which any writ or order is issued under which any part of the Property may be sold in satisfaction of it.

6.07.  Tax and Insurance Escrow.  Lender is not initially requiring an escrow account for taxes and insurance; however, Grantor agrees, upon Lender's request, to make an initial deposit and then monthly payments to a fund for taxes and insurance premiums on the Property.  Monthly payments will be made on the payment dates specified in the Note, and each payment will be one-twelfth (1/12) of the amount that Lender estimates will be required annually for payment of taxes and insurance premiums.  The fund will accrue no interest, and Lender will hold it without bond in escrow and use it to pay the taxes and insurance premiums.  If Grantor has complied with the requirements of this paragraph, Lender must pay taxes before delinquency.  Grantor agrees to make additional deposits on demand if the fund is ever insufficient for its purpose.  If an excess accumulates in the fund, Lender may either credit it to the next monthly deposits until the excess is exhausted or refund it to Grantor.  "Excess" is defined for this provision as an amount exceeding the monthly payment multiplied by the number of months remaining in the calendar year, plus the monthly payment amount multiplied by two.  Before Grantor makes the final payment on the Note, Lender will credit to that payment the whole amount then in the fund or, at Lender's option, refund it after the Note is paid.  If this Deed of Trust is foreclosed, any balance in the fund over that needed to pay taxes, including taxes accruing but not yet payable, and to pay insurance premiums will be paid under "Trustee's Duties".  If the Property is transferred, any balance then in the fund will be still subject to the provisions of this paragraph and will inure to the benefit of the transferee.  Deposits to the fund described in this paragraph are in addition to the payments provided for in the Note.

6.08.  Condemnation.

(a)  Grantor assigns to Lender all judgments, decrees, and awards for injury or damage, direct or con-sequential, to the Property, and all awards pursuant to proceedings for condemnation or other taking, whether direct or indirect, of any part of the Property (collectively the "Condemnation Benefits").  Lender may apply any condemnation proceeds to the Debt in such manner as Lender may elect.  Grantor will promptly notify Lender of any action relating to any taking, whether direct or indirect, of any part of the Property.  Grantor will, unless otherwise directed by Lender in writing, file or defend its claim under any such action and prosecute same with due diligence to its final disposition and will cause any awards or settlements to be paid over to Lender.  Grantor authorizes Lender, at Lender's option, as attorney-in-fact for Grantor, to commence, appear in, and prosecute, in Lender's or Grantor's name, any action relating to any taking, whether direct or indirect, of the Property, or for conveyances in lieu thereof, are hereby assigned and will be paid to Lender.  Lender is entitled to participate in any such action.  Grantor will deliver to Lender such instruments as may be requested by Lender from time to time to permit such par-ticipation.

(b)  In the event of any condemnation resulting in a partial taking of the Property ("Partial Taking") and if, in the reasonable judgment of Lender, the Partial Taking affects the use and operation of the Property requiring the Property to be restored, then, if no Event of Default, has occurred or is then continuing, the condemnation proceeds will be applied to reimburse Grantor for the cost of restoring  the Property.  Grantor will commence and diligently prosecute such restoration.  Grantor will pay all restoration costs (and if required by Lender, Grantor will deposit the total with Lender in advance) in excess of the net proceeds of the condemnation.

**Deed of Trust**                                                                                     Page 11 of 24

(c)  In the event Grantor is entitled to reimbursement of the condemnation proceeds held by Lender, such proceeds will be disbursed from time to time upon Lender being furnished with:  (i) evidence reasonably satisfactory to Lender of the estimated cost of completion of the restoration; (ii) funds sufficient in addition to the net condemnation proceeds to complete the proposed restoration; and (iii) such certificates, waivers of lien, sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance which Lender may reasonably require and approve. Lender may require that all plans and specifications for such restoration be submitted to and reasonably approved by Lender prior to commencement of work.  No payment made prior to the final completion of the restoration may exceed ninety percent (90%) of the value of the work performed from time to time, unless such payment fully and finally pays for all labor and materials through final completion.  Funds other than condemnation proceeds will be disbursed prior to disbursement of condemnation proceeds. The undisbursed balance of such proceeds remaining with Lender, together with funds deposited for that purpose will continually be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the restoration, free and clear of all liens or claims.  Any surplus which may remain out of the condemnation proceeds held by Lender after payment of such costs of restoration will be applied by Lender to payment of the Debt, whether or not then due, in the inverse order of maturity, with any balance to Grantor.

(d)  Grantor authorizes Lender to apply Condemnation Benefits, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to restoration of the Property, or to payment of the Debt, whether or not then due, in the order of application set forth in this Instrument, with any balance to Grantor.  Unless Grantor and Lender otherwise agree in writing, any application of proceeds to principal will not postpone the due date of the installments on the Debt or change the amount of such installments.  Grantor agrees to execute such further evidence of assignment of any Condemnation Benefits as Lender may require.

(e)  In the event Lender, as a result of any such taking, reasonably believes that the payment or performance of any obligation secured by this Instrument is impaired, Lender may declare the Debt immediately due and payable.

6.09.  <u>Taxes on Note or Instrument.</u>  If at any time any law is enacted imposing or authorizing the imposition of any tax upon the Loan Documents or any interest in them (other than income taxes), Grantor will immediately pay all such taxes; provided that, if it is unlawful for Grantor to pay such taxes, Grantor will prepay the Note in full without penalty within sixty (60) days after demand by Lender.

6.10.  <u>Statements by Grantor.</u>  At the request of Lender, Grantor will furnish promptly a written statement or affidavit, in such form as may be required by Lender, stating the unpaid balance of the Note, the date to which interest has been paid and that there are not offsets or defenses against full payment of the Note and performance of the terms of the Loan Documents, or, if there are any such offsets or defenses, specifying them.

6.11.  <u>Repair, Waste, Alterations, Etc.</u>  Grantor will keep every part of the Property in good operating order, repair, and condition and will not commit or permit any waste.  Grantor will promptly make all repairs, renewals, and replacements necessary to such end.  Grantor will discharge all claims for labor performed and material furnished therefor, and will not suffer any lien or claim to any part of the Property.  Grantor has the right to contest in good faith the validity of any such claim, provided Grantor will first establish reserves or other security satisfactory to Lender in such an amount as Lender reasonably requires, but not more than one hundred ten percent (110%) of the amount of the claim, and provided further that Grantor will thereafter diligently proceed to cause the lien to be removed and discharged.  If Grantor fails to discharge any liens, either by paying the amount claimed to be due, or by procuring the discharge of the lien by depositing in court a bond for the amount claimed, or otherwise giving security for the claim, or by taking such action as may be prescribed by law. Grantor will guard every part of the Property from removal and damage, and will not allow any act whereby the

value of any part of the Property may be lessened.  Grantor or any tenant or other person will not materially alter the Property without the prior written consent of Lender.

6.12.  No Drilling or Exploration.  Without the prior written consent of Lender, there will be no drilling or exploring for or extraction, removal, or production of minerals from the surface or subsurface of the Land.  The term "minerals" as used in this Instrument includes without limitation oil, gas, casinghead gas, coal, lignite, hydrocarbons, methane, carbon dioxide, helium, uranium, and all other natural elements, compounds and substances, including sand and gravel.

6.13.  Compliance with Laws.  Grantor, the Property, and Grantor's use of the Property will comply with all laws, rules, ordinances, regulations, covenants, conditions, restrictions, orders and decrees of any govern-mental authority or court applicable to Grantor or the Property and its use, and Grantor will pay all fees or charges of any kind in connection therewith.

6.14.  Income, Expense and Financial Statements.  Grantor will keep and maintain at all times at Grantor's address, or such other place as Lender may approve in writing, complete and accurate books of accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, leases, and other instruments which affect the Property.  Such books, records, contracts, leases, and other instruments are subject to examination and inspection at any reasonable time by Lender.  At least once each year, within ninety (90) days following the end of their respective fiscal years, and at such other times as Lender may request, Grantor will deliver to Lender then current financial statements of Grantor and any other party liable on any portion of the Debt which will include a balance sheet, income statement and a statement of sources and uses of funds for the preceding fiscal year.  All financial statements submitted pursuant to this provision will be in form and substance satisfactory to Lender.  All financial statements will be certified as true and correct by the party submitting such statement or, at Lender's request, audited by an independent certified public accountant.  Within twenty (20) days following the end of each calendar month, Grantor will furnish a monthly income and expense statement concerning the operation of the Property, prepared in accordance with generally accepted accounting principles and certified by Grantor or a duly authorized representative of Grantor.  Grantor will furnish, together with the foregoing financial statements and at any other time upon Lender's request, a Rent schedule for the Property, certified by Grantor, showing the name of each tenant, and for each tenant, the space occupied, the Lease expiration date, the Rent payable and the Rent paid.

6.15.  Hold Harmless of Property and Loan Documents.  **Grantor hereby indemnifies and holds Lender harmless from all liability, damage, or expense incurred by Lender from any claims under the loan documents or relating to the Property, including matters arising by reason of Lender's negligence, but not including matters arising from Lender's gross negligence or willful misconduct. All amounts indemnified against hereunder, including reasonable attorneys' fees, if paid by Lender will bear interest at the Default Interest Rate defined in the Note, will be payable by Grantor immediately without demand, and will be secured by this Instrument.  The foregoing provisions will survive the payment in full of the Debt and the release of this Instrument as to events occur-ring and causes of action arising before such payment and release.**

6.16.  Trade Names.  At the request of Lender, Grantor will execute a certificate in form satisfactory to Lender listing the trade names under which Grantor intends to operate the Property and representing and warranting that Grantor does business under no other trade name with respect to the Property.  Grantor will immediately notify Lender in writing of any change in any trade name, and will, upon request of Lender, execute any additional financing statements and other certificates required to reflect the change in trade names and will execute and file any assumed name certificate required by applicable laws.

6.17.  Further Assurances.  Grantor, upon the request of Lender, will execute, acknowledge, deliver, and record further instruments and do further acts as may be necessary or desirable to carry out the purposes of the Loan Documents and to subject to the liens and security interests created by the Loan Documents any property

---

**Deed of Trust**                                                                                        Page 13 of 24

intended to be covered by the Loan Documents pursuant to their terms, including without limitation any renewals, additions, replacements, improvements, or appurtenances to the Property.

6.18. Recording and Filing. Grantor will cause the recordable Loan Documents and all amendments, supplements, extensions, and substitutions thereof to be recorded and re-recorded in such manner and in such places as Lender reasonably requests. Grantor will pay all recording and re-recording fees, title insurance premiums, and other charges.

6.19. Payment of Property Obligations. Grantor will promptly pay when due all obligations regarding the ownership and operation of the Property.

6.20. Modification. Grantor agrees to be bound by any modification of any of the Loan Documents made by Lender and any subsequent owner of the Property, with or without notice to Grantor, and no such modifications will impair the obligations of Grantor under any Loan Document. Nothing in this section is to be construed as permitting any transfer of the Property which would constitute an Event of Default under other provisions.

6.21. Inspection. Lender may make reasonable entries upon and inspections of the Property.

6.22. Protection of Lender's Security.

(a) If Grantor fails to perform the covenants and agreements contained in this Instrument, or if any action is commenced which affects the Property or the interest of Lender therein, then Lender, at Lender's option, at Grantor's expense, may make appearances, disburse sums and take such action as Lender deems necessary, in its sole discretion, to protect Lender's interest, including without limitation, (i) disbursement of attorney's fees, (ii) entry upon the Property to make repairs, (iii) procurement of satisfactory insurance, and (iv) performance of title related work.

(b) Any amounts so disbursed by Lender, with interest thereon, will become additional Debt. Unless Grantor and Lender agree to other terms of payment, such amounts will be immediately due and payable and will bear interest from the date of disbursement at the Note rate unless contrary to applicable law, in which event such amounts will bear interest at the highest non-usurious rate collectible from Grantor under applicable law. Grantor covenants and agrees that Lender is to be subrogated to the lien of any mortgage or other lien discharged, in whole or in part, by the Debt. Nothing contained in this section will require Lender to incur any expense or take any action under this Instrument.

6.23. Subordinate Deed of Trust. Grantor will not, without the prior written consent of Lender, grant any lien, security interest, or other encumbrance ("Subordinate Instrument") covering any of the Property. If Lender consents to a Subordinate Instrument or if this prohibition is determined by a court to be unenforceable, any Subordinate Instrument will contain express covenants to the effect that:

(a) the Subordinate Instrument is unconditionally subordinated to this Instrument;

(b) if any action (whether judicial or pursuant to a power of sale) is instituted to foreclose or otherwise enforce the Subordinate Instrument, no tenant of any of the Leases will be named as a party defendant, and no action will be taken that would terminate any occupancy or tenancy without the prior written consent of Lender.

(c) Rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Debt then due and expenses incurred in the ownership, operation, and maintenance of the Property in such order as Lender may determine, prior to being applied to any indebtedness secured by the Subordinate Instrument; and

---

(d) written notice of default under the Subordinate Instrument and written notice of the commencement of any action (whether judicial or pursuant to a power of sale) to foreclose or otherwise enforce the Subordinate Instrument will be given to Lender with or immediately after the occurrence of any such default or commencement and Lender will be given a reasonable time to cause the default to be cured.

6.24.  Liens.  Grantor will promptly discharge or bond around any lien which may have priority over or equality with the lien of this Instrument, and Grantor will pay when due the claims of all persons supplying labor or materials to or in connection with the Property.  Without Lender's prior written permission, Grantor will not allow any lien inferior to this Instrument to be perfected against the Property.  Grantor may promptly contest the validity of any such lien claim provided the Grantor delivers to Lender evidence which Lender, in Lender's discretion, determines to be reasonable cause to contest such matter.

6.25.  Appraisal.  Grantor agrees as follows:

(a) Lender may obtain, at Lender's expense, an annual appraisal (or as otherwise desired by Lender) of the Property or any part thereof.  Any appraisal obtained by Lender at Lender's expense will be the property of Lender, and Lender will not be required to disclose the appraisal or the results to Grantor or any other party.  The appraisal will be performed by an appraiser selected by Lender and in accordance with Lender's instructions.

(b) Notwithstanding the foregoing, (i) if Lender is required by Federal, state, or any other applicable law or regulation to obtain an appraisal of the Property, or (ii) if an Event of Default occurs, then Lender may obtain at Grantor's expense an appraisal of the Property, prepared in accordance with written instructions from Lender and performed by a third-party appraiser engaged directly by Lender.  Each such appraiser and appraisal is to be satisfactory to Lender.  The costs of each appraisal obtained will be payable by Grantor to Lender on demand (which obligation Grantor hereby promises to pay) and will be a part of the Debt, unless prohibited by applicable law.

Grantor agrees to cooperate fully with Lender, Lender's agents, and any appraiser selected by Lender in connection with any appraisal.

6.26.  Organization and Power (Limited Liability Company).  Grantor, if a limited liability company, is a duly organized and validly existing limited liability company under applicable state laws and is in good standing in the state of its organization and in the State of Texas.  Grantor has complied with all conditions prerequisite to do business in the State of Texas.  Grantor has all requisite organizational power and all governmental certificates of authority, licenses, permits, qualifications, and documentation to own, lease, and operate the Property and its other properties and to carry on its business as now conducted and as contemplated in the future.  The execution of all Loan Documents is within Grantor's powers, has been duly authorized by all requisite action and is not in contravention of law or the powers of Grantor's limited liability company charter.  Grantor will preserve and keep in full force and effect its existence, rights, franchises, and trade names.

## ARTICLE VII--EVENTS OF DEFAULT

The occurrence of any one of the following will be a default under the Loan Documents ("Event of Default"):

7.01.  Failure to Pay Debt.  Any of the Debt is not paid when due, whether by acceleration or otherwise.

7.02.  Nonperformance of Covenants.  Any covenant in any of the Loan Documents is not fully and timely performed, or the occurrence of any default or event of default under any Loan Document.

7.03.  Notice of Default.  Notwithstanding anything to the contrary, Lender agrees to give notice (the "Notice of Default") to Grantor and any Guarantor in writing of any default, and if the same be not cured within ten (10) days as regards any monetary default and within thirty (30) days as regards any non-monetary default from the date of such Notice of Default, then without further notice, presentment, demand of any kind, either: (a) acceleration of maturity hereof may be imposed if the maturity of the Note has not been accelerated; or (b) if the maturity of the Note has been accelerated and the default is cured as required by the Notice of Default, then the acceleration will be rescinded and the installment provisions of the Note will be reinstated.  The Notice of Default will be deemed to be delivered, whether actually received or not, when deposited in the United States mail, postage fully prepaid, certified mail, and addressed to the intended recipient at the last known address according to the records of the holder delivering the notice.  Notice given in any other manner will be effective only if and when received by the addressee.

7.04.  False Representation.  Any statement, representation or warranty in any of the Loan Documents, any financial statement, or any other writing delivered to Lender in connection with the Debt is false, misleading, or erroneous in any material respect.

7.05.  Bankruptcy or Insolvency.  The owner of the Property or any person obligated to pay any part of the Debt:

(a) does not pay its debts as they become due or admits in writing its inability to pay its debts or makes a general assignment for the benefit of creditors; or

(b) commences any case, proceeding, or other action seeking reorganization, adjustment, liquidation or dissolution of it or its debts under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors; or

(c) in any involuntary case, proceeding, or other action commenced against it which seeks to have an order for relief entered against it, as debtor, or seeks reorganization, adjustment, liquidation or dissolution of it or its debts under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors, (i) fails to obtain a dismissal of such case, proceeding or other action within ninety (90) days of its commencement, or (ii) converts the case from one chapter of the Federal Bankruptcy Code to another chapter, or (iii) is the subject of an order for relief; or

(d) conceals, removes, or permits to be concealed or removed, any part of its property, with intent to hinder, delay, or defraud its creditors or any of them, or makes or suffers a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance, or similar law; or makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or suffers or permits, while insolvent, any creditor to obtain a lien upon any of its property through legal proceedings which is not vacated within ninety (90) days from the date thereof; or

(e) has a trustee, receiver, custodian, or other similar official appointed for or take possession of any part of the Property or any other collateral or has any court take jurisdiction of any other of the other collateral which remains undismissed for a period of ninety (90) days (except where a shorter period is specified herein);

(f) fails to have discharged within a period of ten (10) days any attachment, sequestration, or similar writ levied upon any property of such person; or

(g) fails to pay immediately any final money judgment against such person.

7.06.  Transfer of the Property.  If title to all or any part of the Property or an interest therein is sold or transferred (except transfers by devise, descent or by operation of law) without Lender's prior written consent. Such default does not precipitate any prepayment penalty.  If Grantor is a corporation, partnership, trust, or

---

**Deed of Trust**                                                                                    Page 16 of 24

other legal entity, transfers of beneficial interest in Grantor will not result in default so long as such transfers do not change legally effective controlling ownership of the entity or transfer more than 49% of the ownership interest in the entity to one or more third parties.

7.07. Grant of Easement, Etc. Without the prior written consent of Lender, Grantor grants any easement or dedication, files any plat, condominium declaration, or restriction, or otherwise encumbers the Property, unless such action is expressly permitted by any of the Loan Documents.

7.08. Abandonment. Grantor abandons or vacates any of the Property.

7.09. No Material Adverse Change. There has not occurred, in the opinion of Lender, a material adverse change with regard to the physical condition of the Property caused by Borrower's action (e.g. removal of a portion of the improvements without promptly replacing them) or inaction (e.g. failure to repair broken improvements, maintain deteriorated improvements, or promptly reconstruct improvements which have been damaged or lost). To evidence Lender's opinion on condition, Lender may, at its prerogative, provide a report to Borrower prepared by a third-party professional property condition consultant and detailing the Property conditions deemed by Lender as material adverse changes, the cost of which report to be borne by Borrower.

7.10. Foreclosure of Other Liens. The holder of any lien, security interest or assignment on the Property institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

7.11. Liquidation, Etc. The liquidation, termination, dissolution or failure to maintain good standing in the State of Texas (if applicable), of Grantor or any Guarantor.

## ARTICLE VIII--DEFAULT AND REMEDIES

8.01. Acceleration and Waiver of Notices. Upon the occurrence of an Event of Default, Lender at Lender's option, may declare all of the Debt to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law or provided herein. Grantor acknowledges that the power of sale granted to Lender may be exercised by Lender without prior judicial hearing. Except as otherwise specifically provided herein and in the Loan Documents, Grantor and each Guarantor, surety, and endorser of all or any part of the Debt expressly waive all presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, notices of intention to demand payment, demands for payment, protests, and notices of protest. Except to the extent expressly provided otherwise, Grantor and each Guarantor, surety, and endorser acknowledge and understand that by these waivers they waive any right they may have to receive notices of default under the Loan Documents, as well as any opportunity to cure any such default.

8.02. Notice of Sale. Notice of sale of all or part of the Property by the Trustee will be given in accordance with the requirements of the applicable laws of the State of Texas in effect at the time of such sale for nonjudicial foreclosure of real property. The affidavit of any person having knowledge of the facts to the effect that such service was completed will be prima facie evidence of the fact of service. Any notice that is required or permitted to be given to Grantor may be addressed to Grantor at the address stated in the Loan Documents. Any notice that is to be given by certified mail to any other debtor may, if no address for such other debtor is shown by the records of Lender, be addressed to such other debtor at the address of Grantor as shown by the records of Lender. The Trustee or his successor or substitute may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of Trustee, his successor or substitute. If Trustee or his successor or substitute will have given notice of sale, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

8.03.   Trustee's Sale.   Lender may require the Trustee to sell all or part of the Property in accordance with the requirements of the applicable laws of the State of Texas in effect at the time of such sale for nonjudicial foreclosure of real property.   To the extent permitted by applicable law, any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law.   Trustee may sell all or any portion of the Property, together or in lots or parcels.   In no event will Trustee be required to exhibit, present or display at any such sale any of the Personal Property to be sold at such sale.   Lender may bid and become the purchaser of all or any part of the Property at any trustee's or foreclosure sale hereunder, and the amount of Lender's successful bid may be credited on the Debt.   In the event any sale hereunder is not completed or is defective in the opinion of Lender, such sale will not exhaust the power of sale hereunder and Lender will have the right to cause a subsequent sale or sales to be made hereunder.

8.04.   Partial Sales.   The sale by Trustee of less than the whole of the Property will not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sales under such power until the whole of the Property is sold; and if the proceeds of such sale of less than the whole of the Property is less than the aggregate of the Debt and the expenses thereof, this Instrument and the lien, security interest and assignment hereof will remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Grantor has no right to require the sale of less than the whole of the Property, but Lender has the right, at its sole election, to request Trustee to sell less than the whole of the Property.   If there is a default on the payment of any installment on the Note or any portion of the Debt, and Lender elects not to accelerate the unpaid balance of the Note or Debt, Lender will have the option to proceed with foreclosure in satisfaction of such unpaid installment or other amount either through judicial proceedings or by directing Trustee to proceed as if under a full foreclosure, conducting the sale as herein provided without declaring the entire Debt due.   It is agreed that such sale, if so made, will not in any manner affect the unmatured part of the Debt, but as to such unmatured part this Instrument will remain in full force and effect as though no sale had been made.   Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Debt.

8.05.   Foreclosure of all Property.   The Land, Improvements, and Personal Property may be sold in one or more public sales pursuant to Texas Property Code §51.002 and Texas UCC §9.501(d).   Grantor will assemble the Personal Property and make it available to Lender upon Lender's written request.   Grantor and all persons obligated to pay the Debt agree that notice of sale of the Property provided herein and pursuant to Texas Property Code §51.002 constitutes commercially reasonable notice of the sale of the Property or any part of the Property.   Lender is also entitled to foreclose its security interests against the Personal Property in accordance with any other rights and remedies Lender may have as a secured party under the Texas UCC.

8.06.   Trustee's Deed.   Trustee will deliver to the purchaser a Trustee's deed and such other assignments and documents of transfer and sale as Trustee may deem necessary conveying the Property sold in fee simple with covenants of general warranty.   Grantor covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands.   At any such sale (a) Grantor agrees, in its behalf and in behalf of Grantor's heirs, successors and assigns, that any recitals made in any deed of conveyance given by Trustee with respect to any act or thing having been duly done by Lender or by Trustee hereunder, will be taken by all courts of law and equity as prima facie evidence that the statements or recitals state facts and are without further question to be so accepted, and Grantor ratifies and confirms every act that Trustee or any substitute Trustee hereunder may lawfully do in the premises by virtue hereof, and (b) the purchaser may disaffirm any easement granted, subdivision plat filed, or rental, lease or other contract made in violation of any provision of this Instrument, and may take immediate possession of the Property free from, and despite the terms of, such grant of easement, subdivision plat, or rental, lease or other contract.

8.07.   Proceeds of Sale.   Trustee will apply the proceeds of the sale in the following order:   (a) to all reasonable costs and expenses of the sale, including but not limited to, reasonable Trustee's fees and attorney's fees and costs of title related work; (b) to all sums secured by this Instrument in such order as Lender, in Lender's sole discretion, directs; and (c) the excess, if any, to the person or persons legally entitled thereto.

**Deed of Trust**                                                                                           **Page 18 of 24**

8.08.  Possession After Sale.  If the Property is sold pursuant hereto, Grantor or any person holding possession of the Property through Grantor will immediately surrender possession of the Property to the purchaser at such sale upon the purchaser's written demand.  If possession is not surrendered upon the purchaser's written demand, Grantor or such person will be a tenant at sufferance and may be removed by writ of possession or by an action for forcible entry and detainer.

8.09.  Costs and Expenses.  Lender is entitled to collect all costs and expenses incurred in pursuing such remedies, including but not limited to, reasonable attorney's fees and costs of documentary evidence, abstracts, title reports, and the preparation of documentation.

8.10.  Substitute Trustee.  Lender, at Lender's option, with or without cause, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument and effective from the effective date of such instrument, regardless of when it is recorded.  Without conveyance of the Property, the successor trustee will succeed to all title, power, and duties conferred upon the Trustee by this Instrument and by applicable law.

8.11.  Remedies Cumulative.  Each remedy provided in this Instrument is distinct and cumulative to all other rights or remedies hereunder or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

8.12.  Forbearance by Lender not a Waiver.  Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, is not a waiver, and will not preclude the exercise, of any right or remedy.  The acceptance by Lender of payment of any sum secured by this Instrument after the due date of such payment is not a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment.  The procurement of insurance or the payment of taxes or other liens or charges by Lender is not a waiver of Lender's right to accelerate the maturity of the Debt, nor will Lender's receipts of any awards, proceeds or damages under this Instrument operate to cure or waive Grantor's default in payment of sums secured by this Instrument.

8.13.  Waiver of Marshalling.  Notwithstanding the existence of any other security interests in the Property held by Lender or by any other party, Lender has the right to determine the order in which any portion of the Debt is satisfied from the proceeds realized upon the exercise of the remedies provided herein.  Grantor, any party who consents to this Instrument, and any party who now or hereafter acquires a security interest in the Property and who has actual or constructive notice of this Instrument and Lender's rights and interests under this Instrument, waive any and all right to require the marshalling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided by this Instrument.

ARTICLE IX-ENVIRONMENTAL MATTERS

9.01.  Definitions.  For the purposes of this Article, unless the context otherwise specifies or requires, the following terms will have the following meanings:

(a) "Governmental Requirements" means any and all laws, ordinances, rules, regulations, orders, or determinations of any governmental authority, pertaining to health, safety, or the environment in effect in any and all jurisdictions in which Grantor conducts business or where the Property is located.
(b) "Hazardous Materials" means (i) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.), as amended from time to time ("RCRA"), and regulations promulgated thereunder; (ii) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.), as amended from time to time ("CERCLA"), and regulations promulgated thereunder; (iii) any toxic substance as defined under or regulated by the Toxic Substances Control Act; (iv) asbestos, polychlorinated biphenyls, radon, or explosive or radioactive materials; (v) underground and above ground storage tanks, whether

empty, filled or partially filled with any substance, including without limitation any petroleum product or any other "hazardous substance"; (vi) any substance the presence of which on the Property is prohibited by any Governmental Requirements; and (vii) any other substance which by any Governmental Requirements requires special handling or notification of any federal, state, or local governmental entity in its collection, storage, treatment, or disposal.

(c) "Hazardous Materials Contamination" means the contamination (whether presently existing or hereafter occurring) of any improvements, facilities, soil, groundwater, air, or other elements on or of the Property by Hazardous Materials, or the contamination of the buildings, facilities, soil, groundwater, air, or other elements on or of any other property as a result of Hazardous Materials at any time (whether before or after the date of this Instrument) emanating from the Property.

(d) "Environmental Claim" means any investigative, enforcement, cleanup, removal, containment, remedial, or other governmental or regulatory action at any time threatened, instituted, or completed pursuant to any Governmental Requirements against Grantor or against or with respect to the Property or its use, and any claim threatened or made by any person against Grantor or against or with respect to the Property or its use, relating to damage, contribution, cost recovery, compensation, or injury resulting from any alleged breach or violation of any Governmental Requirements.

(e) "Environmental Condition" means any condition, circumstance, or matter related to or connected with the Property or Grantor's ownership and use of the Property which is covered by any Governmental Requirements relating to environmentally hazardous materials.

9.02.  Grantor Representations.  Grantor represents and warrants that Grantor has no knowledge of the existence or presence of any Hazardous Materials on the Property, emanating from the Property, or migrating to the Property, nor of any Hazardous Materials Contamination of the Property.

9.03.  Allocation of Risks and Indemnity.  **Grantor agrees with Lender and Trustee that, except to the limited extent specified herein, all risk of loss associated with the presence of any Hazardous Material in, on, or about the Property or with respect to any Hazardous Materials Contamination of the Property or any adjacent property lies solely with Grantor who hereby agrees to bear all risks and costs associated with any damages or liability therefrom including any and all costs of cleaning up, remediating, or otherwise curing any Hazardous Materials Contamination.  Grantor will (except to the limited extent specified herein) indemnify, defend, and hold Lender harmless from and against all liabilities, damages, claims, costs and expenses (including reasonable costs of defense), arising out of or associated with, in any way, the existence of Hazardous Materials in, on, or about the Property or any Hazardous Materials Contamination, including those arising out of or alleged to have arisen from Lender's negligence, but not from Lender's gross negligence or willful misconduct.**

9.04.  Lender's Responsibility.  The provisions hereof relating to allocation of risks and indemnity do not apply to any loss, damage, or expense resulting solely from Lender's affirmative placement of any Hazardous Materials on or about the Property, and Lender is responsible therefor.  Except to the limited extent provided in this Article, all risk of loss associated with Hazardous Materials or Hazardous Materials Contamination is hereby allocated to Grantor who will bear the same.

9.05.  Compliance with Governmental Requirements.  Grantor will at all times comply fully with all applicable Governmental Requirements.

9.06.  Inspection.  Lender may enter the Property at reasonable times to inspect for the existence of Hazardous Materials or Hazardous Materials Contamination.  If Lender reasonably believes that the value of the Property may be adversely affected by reason of Hazardous Materials or Hazardous Materials Contamination, then Lender may, at Grantor's expense, have an environmental study or audit made with respect to the Property, in such detail and scope as the circumstances then warrant, provided that Lender may not exercise such right

---

more frequently than once each twelve (12) months unless there is reasonably objective evidence or a governmental claim that Hazardous Materials or Hazardous Materials Contamination affect the Property.

9.07.  No Waiver.  Notwithstanding any provision herein, or any rights or remedies granted by this Instrument, Lender does not waive and expressly reserves all rights and benefits now or hereafter accruing or available to Lender under the "security interest exception" set forth in 42 C.F.R. §300.1100.  No action taken by Lender pursuant to the Loan Documents will be deemed or construed to be a waiver on relinquishment of any such rights or benefits under the "secured creditor exception".

## ARTICLE X - GENERAL PROVISIONS

10.01.  Release.  Upon payment of all sums and the performance of all obligations secured by this Instrument, Lender will release this Instrument.  Grantor will pay Lender's reasonable costs incurred in releasing this Instrument.

10.02.  Debt & Lien Matters.  From time to time. Lender may, at Lender's option, without giving notice to or obtaining the consent of Grantor, Grantor's successors or assigns or any inferior lienholder or Guarantor, without liability on Lender's part and notwithstanding the existence of an Event of Default, extend the time for payment of the Debt or any part thereof, reduce the payments thereon, release anyone liable on any of the Debt, accept a renewal note or notes therefor, modify the terms and time of payment of the Debt, release from the liens of this Instrument any part of the Property, take or release other or additional security, reconvey any part of the Property, consent to any map or plan of the Property, consent to the granting of any easement, join in any extension or subordination agreement, and agree in writing with Grantor to modify the rate of interest or period of amortization of the Note or change the amount of the installments payable thereunder.  Any actions taken by Lender pursuant to the terms of this section will not affect the obligations of Grantor or Grantor's successors or assigns under the Loan Documents, will not affect the guaranty of any person or entity for payment of the Debt or any part thereof, and will not affect the liens or priority of liens of this Instrument on the Property. Extensions of the Debt will automatically cause the liens securing it to be so extended.  Grantor will pay Lender a reasonable charge, together with such title insurance premiums and attorney's fees as may be incurred at Lender's option, for any such action if taken at Grantor's request.

10.03.  Joint and Several Liability.  All covenants and agreements of Grantor are joint and several.

10.04.  Usury Disclaimer.  The term "Maximum Lawful Rate" means the maximum rate of interest and the term "Maximum Lawful Amount" means the maximum amount of interest that are permissible under applicable state or federal law for the type of loan evidenced by the Loan Documents.  Lender does not intend to contract for, charge, or receive more than the Maximum Lawful Rate or Maximum Lawful Amount permitted by applicable state or federal law, and to prevent such an occurrence Lender and Grantor agree that all amounts of interest, whenever contracted for, charged or received by Lender, with respect to the loan of money evidenced by the Note or with respect to any other amount payable under any of the Loan Documents, will be spread, prorated or allocated over the full period of time the Note is unpaid, including the period of any renewal or extension of the Note.  If demand for payment of the Note is made by Lender prior to the full stated term, the total amount of interest contracted for, charged or received to the time of such demand will be spread, prorated or allocated along with any interest thereafter accruing over the full period of time that the Note thereafter remains unpaid for the purpose of determining if such interest exceeds the Maximum Lawful Amount.  At maturity (including maturity due to Lender's acceleration of the Note) or on earlier final payment of the Note, Lender will compute the total amount of interest that has been contracted for, charged or received by Lender or payable by Grantor under this Note and compare such amount to the Maximum Lawful Amount that could have been contracted for, charged or received by Lender.  If such computation reflects that the total amount of interest that has been contracted for, charged or received by Lender or payable by Grantor exceeds the Maximum Lawful Amount, then Lender will apply such excess to the reduction of the principal balance and not to the payment of interest; or if such excess interest exceeds the unpaid principal balance, such excess will be refunded to Grantor.  This provision concerning the crediting or refund of excess interest will control and take

---

precedence over all other agreements between Grantor and Lender so that under no circumstances will the total interest contracted for, charged or received by Lender exceed the Maximum Lawful Amount.

10.05.  Partial Invalidity.  If any portion of the Debt is also secured by a vendor's lien and/or superior title to the Property or any portion of it, payments in reduction of the Debt will be applied first to those portions not so secured.

10.06.  Authorization for Transfer of Tax Lien.  Grantor hereby authorizes Lender to pay the taxes, penalties and interest imposed by any taxing unit on the Property.  This Instrument is sworn to for the specific purpose of causing the tax collector, pursuant to § 32.06 of the Texas Property Tax Code, to transfer the tax lien to Lender on the payment by Lender of the taxes, interest and/or penalty assessed and unpaid on the Property, such that Lender shall have all of the privileges, rights and remedies authorized by that statute, as it may be changed from time to time.

10.07.  Unearned Premiums.  On default, Lender has the right, power and authority to prevent cancellation of the insurance coverage and/or the reimbursement of any unearned premiums to Grantor herein.  Further, any reimbursement of unearned premiums constitute "receipts from the Property" and shall be controlled by the assignment of rents provision of this Instrument.

10.08.  Modification of Note.  Lender may at any time and from time to time, without notice to, and without the consent of, any other person or entity (except for Grantor in the case of a modification of the terms of the Note or this Deed of Trust), (1) extend or accelerate the time of payment of the indebtedness secured hereby, (2) agree to modify the terms of the Note or this Deed of Trust, including increasing payments of interest and principal, (3) release any person liable for payment of any indebtedness secured hereby or for performance of any obligation, (4) release all or any part of the security held for the indebtedness secured hereby, or (5) exercise or refrain from exercising or waive any right Lender may have.  Lender shall have such rights and may exercise them without affecting the lien or priority of this Deed of Trust upon the Property or any part thereof, and without affecting the liability of any guarantor or surety, notwithstanding the fact that guarantors, sureties, junior mortgages, judgments, or other claims or encumbrances may be impaired, prejudiced, or otherwise adversely affected thereby.

## ARTICLE XI - MISCELLANEOUS

11.01.  Attorney's Fees.  If either party retains an attorney to enforce this Instrument, the prevailing party is entitled to recover reasonable attorney's fees, court costs, title related work, bankruptcy related work, and related expenses.

11.02.  Binding Effect.  This Instrument shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, successors and assigns where permitted by this Instrument.

11.03.  Choice of Law.  THIS INSTRUMENT WILL BE GOVERNED BY THE APPLICABLE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES OF AMERICA APPLICABLE TO TRANSACTIONS IN THE STATE OF TEXAS, excluding any conflicts-of-law rule or principle that might refer the construction or interpretation of this Instrument to the laws of another state.  Each party hereby submits to the jurisdiction of the state and federal courts in the State of Texas and to venue in the County in which the Property is situated.

11.04.  Counterparts.  This Instrument may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document.  All counterparts are to be construed together and constitute one and the same instrument, and the signature pages may be removed from the counterparts and combined on one instrument for recording or convenience.

11.05.   **Effect of Waiver or Consent**.   No waiver or consent, express or implied, by any party to or of any breach or default by any party in the performance by such party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such party of the same or any other obligations of such party hereunder.   Failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder until the applicable statute of limitation period has run.

11.06.   **Further Assurances**.   In connection with this Instrument as well as all transactions contemplated by this Instrument, each signatory party hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Instrument and all such transactions.

11.07.   **Integration**.   This Instrument contains the complete agreement between the parties and cannot be varied except by the written agreement of the parties.   The parties agree that there are no oral agreements, understandings, representations or warranties which are not expressly set forth herein.

11.08.   **Legal Construction**.   In case any one or more of the provisions contained in this Instrument shall for any reason be invalid, illegal or unenforceable in any respect, to the extent such invalidity or unenforceability does not destroy the basis of the bargain among the parties, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Instrument shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.   Whenever required by the context, as used in this Instrument, the singular number shall include the plural and the neuter shall include the masculine or feminine gender, and vice versa.   The Article and Section headings appearing in this Instrument are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section.   This Instrument shall not be construed more or less favorably between the parties by reason of authorship or origin of language.

11.09.   **Notices**.   Any notice or communication required or permitted hereunder shall be deemed to be delivered, whether actually received or not, when deposited in the United States mail, postage fully prepaid, registered or certified mail, and addressed to the intended recipient at the address shown herein, and if not so shown, then at the last known address according to the records of the party delivering the notice.   Notice given in any other manner shall be effective only if and when received by the addressee.   Any address for notice may be changed by written notice delivered as provided herein.

11.10.   **Recitals**.   Any recitals in this Instrument are represented by the parties hereto to be accurate, and constitute a part of the substantive agreement.

11.11.   **Time**.   Time is of the essence.   Unless otherwise specified, all references to "days" shall mean and refer to calendar days.   Business days shall exclude all Saturdays, Sundays, and Texas legal banking holidays.   In the event the date for performance of any obligation hereunder shall fall on a Saturday, Sunday or Texas legal banking holiday, then that obligation shall be performable on the next following regular business day.

[EXECUTION PAGES FOLLOW]

WC 5TH AND WALLER, LLC

By: _____

Natin Paul, President

STATE OF TEXAS
COUNTY OF TRAVIS

SUBSCRIBED, SWORN TO and ACKNOWLEDGED before me on the 18th day of September, 2017, by NATIN PAUL, President, on behalf of WC 5th and Waller, LLC, a Delaware limited liability company.

_____
Notary Public, STATE OF TEXAS

LAURA BYRD
Notary Public, State of Texas
Comm. Expires 10-03-2020
Notary ID 130846648

AFTER RECORDING, RETURN TO:

THE FIRST NATIONAL BANK OF BEEVILLE
1400 E. Houston Street
Beeville, Texas 78102

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
September 19 2017 04:10 PM
FEE: $ 118.00  2017150851

# Exhibit C

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*
Dana DeBeauvoir, County Clerk
Travis County, Texas
Feb 18, 2020 12:31 PM     Fee: $42.00
**2020025670**
*Electronically Recorded*

# TRANSFER OF NOTE AND LIEN

**Effective Date:** February 11, 2020

**Holder:**       **SPIRIT OF TEXAS BANK, SSB, successor in interest to
THE FIRST NATIONAL BANK OF BEEVILLE**
625 University Drive East
College Station, Brazos County, Texas 77840

**Transferee:**  **501 WALLER LENDER LLC**
c/o Spear Street Capital LLC
One Market Plaza
Spear Tower, Suite 4125
San Francisco, San Francisco County, California 94105

**Note:**        Promissory Note dated September 19, 2017, in the original amount $6,640,000.00, executed
by WC 5th and Waller, LLC ("the "Mortgage Borrower"), payable to the order of The First
National Bank of Beeville.

Note and Lien are Described in the Following Documents ("Lien Documents"):

A Deed of Trust dated September 19, 2017, recorded under Clerk's File No. 2017150851, Official Public
Records, Travis County, Texas.

Property (including any improvements):

Lots 7, 8, 9, 10, 11 and 12, Block 4, Outlot 3, Division A, in the City of Austin, Travis County, Texas,
according to the map or plat recorded in Volume 1, Page 8, Plat Records of Travis County, Texas.

## Transfer of Note and Lien

Holder transfers and assigns the Note and the liens and security interests ("Lien") on the Property
granted in the Lien Documents and the other loan documents listed in Exhibit A hereto to Transferee.

This transfer is without recourse against and/or without representation or warranty by Holder, except as set forth
in this Transfer of Note and Lien (this "Agreement").

Holder hereby represents and warrants on and as of the Effective Date as follows:

1. Holder is the person entitled to enforce the Note.
2. The Lien is valid against the Property.
3. Holder expressly assigns unto Transferee all rights to establish or enforce the Lien as security for
   payment of any other indebtedness.
4. The execution, delivery and performance of this Agreement is within Holder's powers, has been duly
   authorized by all necessary action, and does not contravene Holder's charter or any law or
   contractual restriction binding upon Holder.
5. This Agreement is the legal, valid and binding obligation of Holder enforceable against Holder in
   accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency,
   receivership, conservatorship, reorganization, insolvency, moratorium or other similar laws affecting
   the enforcement of creditors' rights generally, and by general principles of equity (regardless of
   whether such enforceability is considered in a proceeding in equity or at law), and except as the
   enforcement of rights with respect to indemnification and contribution obligations may be limited by
   applicable law.

6. Holder is duly organized or chartered, validly existing, and in good standing under the laws of the United States of America and, to Holder's actual knowledge, possesses all licenses and authorizations necessary to carry on its business.

7. This Agreement has been duly executed and delivered by Holder.

8. The outstanding principal amount of the Note is $6,183,277.39 as of the Effective Date hereof.

9. Immediately prior to the sale, transfer and assignment to Transferee, Holder had good title to, and was the sole owner of, the Note, free and clear of any and all liens, charges, pledges, participations, or security interests or encumbrances of any nature, in or to the Note other than any servicing rights appointment, subservicing or similar agreement. Holder is the current holder of the Note and has never assigned or transferred the same or any interest therein or right pertaining thereto. Holder has full right and authority to sell, assign and transfer the Note, and the assignment to Transferee constitutes a legal, valid and binding assignment of the Note.

10. Exhibit A represents a true and correct list of all material agreements and instruments evidencing and/or securing the Note as of the date hereof. There are no amendments, modifications, supplements, terminations or waivers of any such agreement or instrument except as set forth on Exhibit A. There have been no other agreements or understandings, whether written or oral, between Mortgage Borrower and Holder.

11. Neither the lien of the Lien Document nor any other collateral and mortgaged property secured by the documents listed on Exhibit A have been impaired, modified, satisfied or released by the Holder; and, neither Mortgage Borrower nor any guarantor of the Mortgage Loan have been released of their obligations under any of the documents listed on Exhibit A by the Holder.

12. Except as described in Exhibit A, Holder has not delivered to Mortgage Borrower any notice of default, and Mortgage Borrower has not delivered to Holder any notice of default by Holder.

[THE REMAINDER OF THIS PAGE
INTENTIONALLY LEFT BLANK]

When the context requires, singular nouns and pronouns include the plural.

SPIRIT OF TEXAS BANK, SSB

By: _Kent Fry_
Name: _KENT FRY_
Title: _President - South Texas Region_

STATE OF TEXAS
COUNTY OF _Bee_

This instrument was acknowledged before me on the _11th_ day of _February_, 2020, by _Kent Fry_, _President STX Region_ of SPIRIT OF TEXAS BANK, SSB, a state savings bank, on behalf of said bank.

DIANA DENISSE ARCHER
ID# 12959073-5
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-20-2021

Notary Public, STATE OF TEXAS

_Diana D. Archer_

3

<u>EXHIBIT A</u>

Additional Loan Documents:

    1. Loan Agreement dated September 19, 2017 between WC 5th and Waller, LLC (the "<u>Borrower</u>") and The First National Bank of Beeville (the "<u>Lender</u>")

    2. Guaranty Agreement dated September 19, 2017 executed by Natin Paul (the "<u>Guarantor</u>") for the Promissory Note dated September 19, 2017

    3. Guaranty Agreement dated September 19, 2017 executed by World Class Capital Group, LLC (the "<u>Guarantor</u>") for the Promissory Note dated September 19, 2017

    4. Loan Policy of Title Insurance dated September 19, 2017, issued by Fidelity National Title Insurance Company, Policy No. 2744343-212270634

    5. Certificate of Incumbency & Authority dated September 19, 2017, executed by WC 5th and Waller, LLC (the "<u>Company</u>") and World Class Holdings V, LLC (the "<u>Owner</u>").

    6. Certificate of Incumbency & Authority dated September 19, 2017, executed by World Class Capital Group, LLC (the "<u>Company</u>")

Other Material Documents and Disclosures:

    1. Special Warranty Deed dated September 19, 2017, executed by WBH, LTD. PARTNERSHIP, (the "<u>Grantor</u>") recorded under Clerk's File No. 2017150850, Official Public Records, Travis County, Texas

    2. Certificate of Liability Insurance and Evidence of Commercial Property Insurance dated June 4, 2019 produced by Swingle, Collins & Associates

    3. Survey dated April 10, 2017, issued by Waterloo Surveyors, Inc.

    4. 2017 Real Estate Appraisal Report dated July 23, 2017, completed by Sterling Appraisal Services, LLC

    5. Paid tax receipts for tax years 2016, 2017, 2018.  Property taxes for 2019 have NOT been paid.

    6. Loan Payoff Statement as of February 20, 2020, issued by Spirit of Texas Bank

    7. 2017 Tax Return of Natin Paul

    8. Natin Paul Statement of Financial Condition, dated September 30, 2018

    9. Certificate of Formation for WC 5th and Waller, LLC filed on August 1, 2017 with the Secretary of State of Delaware

    10. Limited Liability Company Agreement of WC 5th and Waller, LLC dated effective as of August 1, 2017

    11. Certificate evidencing authority to transact business in Texas for WC 5th and Waller, LLC filed with the Texas Secretary of State effective as of August 3, 2017

    12. Employee Identification Number (82-2393300) from the Internal Revenue Service dated August 7, 2017

    13. Franchise Tax Account Status for WC 5th and Waller, LLC as of February 10, 2020

**ALLONGE ENDORSEMENT
TO $6,640,000.00 NOTE FROM WC 5TH AND WALLER, LLC
PAYABLE TO THE FIRST NATIONAL BANK OF BEEVILLE
DATED SEPTEMBER 19, 2017, ATTACHED HERETO
AND INCORPORATED BY REFERENCE**

FOR VALUE RECEIVED, the undersigned, Sprit of Texas Bank, ssb, as successor in interest to The First National Bank of Beeville, hereby sells, transfers and assigns to **501 WALLER LENDER LLC**, the $6,640,000.00 Note, together with the liens securing the same, without recourse on the undersigned, except as expressly set forth in the Transfer of Note and Lien executed as of the date hereof.

**SPIRIT OF TEXAS BANK, SSB**

By: _____

Name: _KENT FRY_

Title: _President - South Texas Region_

Effective Date:  February 11, 2020

Exhibit D

4 pgs    202140107

STAYS IN FILE

### Notice of Foreclosure Sale

1.  **Property to Be Sold**. The real property and improvements described in and mortgaged in the Deed of Trust, including the legally described real property set forth on Exhibit "A" attached hereto and made a part hereof, and all rights and appurtenances thereto.

2.  **Instrument to be Foreclosed**. The instrument to be foreclosed is the Deed of Trust dated September 19, 2017 and recorded on September 19, 2017 as Document No. 2017150851 of the Official Public Records of Travis County, Texas ("**Deed of Trust**"), as affected by that certain Transfer of Note and Lien dated February 11, 2020 and recorded on February 18, 2020 as Document No. 2020025670 of the Official Public Records of Travis County, Texas.

3.  **Date, Time and Place of Sale**. The sale is scheduled to be held at the following date, time, and place:

    Date:     Tuesday, May 4, 2021

    Time:     The sale will begin no earlier than 10:00 A.M. or no later than three hours thereafter. The sale will be completed by no later than 4:00 P.M.

    Place:    West steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas 78701.

4.  **Terms of Sale**. The sale will be conducted as a public auction to the highest bidder for cash, subject to the provisions of the Deed of Trust permitting the Lender thereunder to have the bid credited to the note up to the amount of the unpaid debt seemed by the Deed of Trust at the time of sale.

    Those desiring to purchase the property will need to demonstrate their ability to pay cash on the day the Property is sold, as the purchase price will be payable immediately on acceptance of the bid by the Substitute Trustee.

    The sale will be made expressly subject to any title matters set forth in the Deed of Trust, but prospective bidders are reminded that by law the sale will necessarily be made subject to all prior matters of record affecting the property, if any, to the extent that they remain in force and effect and have not been subordinated to the Deed of Trust. The sale shall not cover any part of the property that has been released of public record from the lien of the Deed of Trust. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

    Pursuant to the Deed of Trust, the Lender has the right to direct the Trustee/Substitute Trustee to sell the property in one or more parcels and/or to sell all or only part of the property.

    Pursuant to section 51.009 of the Texas Property Code, the property will be sold in "**AS IS, WHERE IS" condition, without any express or implied warranties, except as to the warranties of title (if any) provided for under the Deed of Trust**. Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the property.

Pursuant to section 51.0075 of the Texas Property Code, the Substitute Trustee reserves the right to set further reasonable conditions for conducting the sale. Any such further conditions shall be announced before bidding is opened for the first sale of the day held by the Substitute Trustee.

5.    **Type of Sale**. The sale is a nonjudicial deed-of-trust lien and security interest foreclosure sale being conducted pursuant to the power of sale granted by the Deed of Trust.

The real property and personal property encumbered by the Deed of Trust will be sold at the sale in accordance with the provisions of the Deed of Trust and as permitted by section 9.604(a) of the Texas Business and Commerce Code.

6.    **Obligations Secured**. The Deed of Trust provides that it secures the payment of the indebtedness and obligations therein described (collectively, the **"Obligations"**), including but not limited to the Promissory Note in the original principal amount of $6,640,000.00, executed by WC 5th And Waller, LLC, a Delaware limited liability company, and now payable to the order of 501 Waller Lender LLC, a Delaware limited liability company, the current owner and holder of the Obligations and is the Lender under the Deed of Trust.

7.    **Guaranty**. The Obligations are guaranteed by a Guaranty Agreement dated September 19, 2017, executed by Natin Paul, and by a Guaranty Agreement dated September 19, 2017, executed by World Class Capital Group, LLC, each in favor of Lender.

8.    **Default and Request to Act**. Default has occurred under the Deed of Trust, and the Lender has requested me, as Substitute Trustee, to conduct this sale. Notice is given that before the sale the Lender may appoint another person substitute trustee to conduct the sale.

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

Dated:  April 13, 2021

_____
A. Lee Righy, Substitute Trustee
3500 Jefferson Street, Suite 330
Austin, Texas 78731
Ph: 512-782-2061
Fax: 512-782-2061

STATE OF TEXAS        §
                            §

COUNTY OF TRAVIS     §

    This instrument was acknowledged before me on the 13ᵗʰ day of April, 2021, by A. Lee Rigby, Substitute Trustee, who acknowledged to me that he executed the same for the purposes and consideration therein expressed, and in the capacity therein stated.

_Cara Holt_
_____
Notary Public, State of Texas

CARA HOLT
Notary Public, State of Texas
Comm. Expires 04-15-2023
Notary ID 128364857

## EXHIBIT "A"

Lots 7, 8, 9, 10, 11 and 12, inclusive, Block 4, Outlot 3, DIVISION A, in the City of Austin, Texas, according to the map or plat thereof recorded in Volume 1, Page 8, Plat Records of Travis County, Texas



**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Dana DeBeauvoir, County Clerk
Travis County, Texas

**202140107**

Apr 13, 2021 11:00 AM

Fee: $3.00        MACEDOS

# Exhibit E

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## WC 5TH AND WALLER, LLC

This Limited Liability Company Agreement (together with any exhibits and/or schedules attached hereto, this "Agreement") of WC 5TH AND WALLER, LLC, dated and effective as of August 1, 2017, is entered into by WORLD CLASS HOLDINGS V, LLC, a Delaware limited liability company, as the sole member (the "Member") and by WORLD CLASS HOLDINGS V, LLC, a Delaware limited liability company, as the Manager (as hereinafter defined).

A Certificate of Formation was filed under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.), as amended from time to time (the "Act") on August 1, 2017. The Member and the Manager hereby agrees as follows:

1.  **Name.**  The name of the limited liability company governed hereby (the "Company") is WC 5TH AND WALLER, LLC.

2.  **Certificates.**  Brian Elliott is hereby designated an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware.  Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, his powers as an "authorized person" ceased, and the Manager (as defined below) thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act.  The Manager is hereby authorized to execute, deliver and file any certificates (and any amendments and/or restatements thereof) (i) to be filed in the office of the Secretary of State of the State of Delaware, or (ii) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3.  **Purpose.**  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act.

4.  **Powers.**  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have the power and is hereby authorized to:

(a)  Acquire by purchase, lease, contribution of property or otherwise, own, hold, sell, convey, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)  Act as a trustee, executor, nominee, bailee, director, officer, agent or in some other fiduciary capacity for any person or entity and to exercise all of the powers, duties, rights and responsibilities associated therewith;

(c)  Take any and all actions necessary, convenient or appropriate as trustee, executor, nominee, bailee, director, officer, agent or other fiduciary, including the granting or approval of waivers, consents or amendments of rights or powers relating thereto and the execution of appropriate documents to evidence such waivers, consents or amendments;

          (d)      Operate, purchase, maintain, finance, improve, own, sell, convey, assign, mortgage, lease or demolish or otherwise dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

          (e)      Borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and secure the same by mortgage, pledge or other lien on the assets of the Company;

          (f)      Invest any funds of the Company pending distribution or payment of the same pursuant to the provisions of this Agreement;

          (g)      Prepay, in whole or in part, refinance, recast, increase, modify or extend any indebtedness of the Company and, in connection therewith, execute any extensions, renewals or modifications of any mortgage or security agreement securing such indebtedness;

          (h)      Enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any person or entity affiliated with the Member, necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company;

          (i)      Employ or otherwise engage employees, managers, contractors, advisors, attorneys and consultants and pay reasonable compensation for such services;

          (j)      Enter into partnerships, limited liability companies, trusts, associations, corporations or other ventures with other persons or entities in furtherance of the purposes of the Company; and

          (k)      Do such other things and engage in such other activities related to the foregoing as may be necessary, convenient or incidental to the conduct of the business and purposes of the Company, and have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

     5.      **Principal Business Office.** The principal business office of the Company shall be located at such location as may hereafter be determined by the Manager.

     6.      **Registered Office.** The address of the registered office of the Company in the State of Delaware is c/o Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904.

     7.      **Registered Agent.** The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904.

     8.      **Members.** The name and the mailing address of the Member are as follows:

| Name | Address |
|---|---|
| World Class Holdings V, LLC | c/o World Class Capital Group, LLC |
| | 401 Congress Avenue, 33rd Floor |
| | Austin, TX 78701 |

9.      **Limited Liability.**  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and neither the Member nor the Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

10.      **Capital Contributions.**  The Member is admitted as the sole member of the Company upon its execution and delivery of this Agreement.  The Member has contributed one hundred dollars ($100), in cash, and no other property, to the Company.

11.      **Additional Contributions.**  The Member is not required to make any additional capital contribution to the Company.  However, the Member may at any time, in its sole discretion, make additional capital contributions to the Company.

12.      **Allocation of Profits and Losses.**  The Company's profits and losses shall be allocated solely to the Member.

13.      **Distributions.**  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Manager.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14.      **Management.**

(a)      The business and affairs of the Company shall be managed by a "manager" of the Company within the meaning of the Act (the "Manager").  The Manager shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by managers of limited liability companies under the laws of the State of Delaware.  The Manager has the authority to bind the Company.  Except to the extent expressly provided herein or otherwise delegated by the Manager, the Member shall not have authority to bind the Company.

(b)      The Member shall appoint the Manager and may remove the Manager at any time with or without cause.  A person appointed as Manager shall serve until the earlier of his death, resignation or removal, and upon the occurrence of any such event, the Member shall promptly appoint a replacement Manager.  Each person serving as Manager shall be required to execute an acknowledgment of this Agreement.  The Member hereby appoints World Class Holdings, LLC as the initial Manager.

15.      **Officers.**  The Manager may, from time to time as he deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign titles (including, without limitation, President, Chief Financial Officer and Treasurer) to any such person.  Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Each Officer shall have the authority to bind the Company in the ordinary course of business.  Any delegation pursuant to this Section 15 may be revoked at any time by the Manager.  An Officer may be removed with or without cause by the Manager. Each Officer shall serve until the earlier of his death, resignation or removal.  The Manager

-3-

hereby consents to the appointment hereunder of the initial Officers, whose names and titles are set forth on Schedule A hereto.

16.  **Other Business.**  Notwithstanding any duty otherwise existing at law or in equity, the Member may engage in or possess an interest in other business ventures of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17.  **Exculpation and Indemnification.**

(a)  No Member, Manager, employee or agent of the Company or any affiliate thereof (each a "Covered Person") shall be liable to the Company or to any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's willful misconduct. To the full extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of willful misconduct of such Covered Person with respect to such acts or omissions; provided, however, that any indemnity under this Section 17 shall be provided out of and to the extent of Company assets only, and the Member shall not have personal liability on account thereof.

(b)  To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 17. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(c)  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Member otherwise existing at law or in equity, are agreed by the Member to replace such other duties and liabilities of such Covered Person. The foregoing provisions of this Section 17 shall survive any termination of this Agreement.

18.  **Assignments.**  The Member may at any time assign in whole or in part its limited liability company interest in the Company. If the Member assigns all or part of its interest in the Company pursuant to this Section 18, the assignee shall be admitted to the Company upon its

execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately prior to the assignment, and, if the Member assigns all of its interest in the Company, then immediately following such admission, the assigning Member shall cease to be a member of the Company.

19.     **Resignation.** The Member may at any time resign from the Company.

20.     **Admission of Additional Members.** One or more additional members of the Company may be admitted to the Company with the written consent of the Member. The admission of an additional member of the Company shall be effective upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21.     **Dissolution.**

(a)     The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member, (ii) at any time there are no members of the Company unless the Company is continued in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)     The bankruptcy (as defined in Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(c)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

22.     **Books and Records.** The Manager shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours. The Company, and the Manager on behalf of the Company, shall not have the right to keep confidential from the Member any information that the Manager would otherwise be permitted to keep confidential from the Member pursuant to Section 18-305(c) of the Act. The Company's books of account shall be kept using the method of accounting determined by the Manager or the Member.

23.     **Separability of Provisions.** Each provision of this Agreement shall be considered separable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

24.     **Entire Agreement.** This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

25.     **Governing Law.**  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

26.     **Amendments.**  This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.  The Member shall promptly provide a copy of any such amendment to the Manager.

27.     **Sole Benefit of Member.**  Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

28.     **Binding Agreement.**  The Member agrees that this Agreement constitutes a legal, valid and binding obligation of the Member and may be enforced against the Member by the Manager.

29.     **Counterparts.**  This Agreement may be executed in any number of counterparts (including any facsimiles or .pdfs thereof), each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

30.     **Rules of Construction.**  Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  Pronouns apply equally to the masculine, feminine and neuter gender forms of such terms.  The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All Section references not attributed to a particular document shall be references to such parts of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first written above.

MEMBER:

WORLD CLASS HOLDINGS V, LLC,
a Delaware limited liability company

By: _____
    Name:  Natin Paul
    Title:   President

MANAGER:

WORLD CLASS HOLDINGS V, LLC,
a Delaware limited liability company

By: _____
    Name:  Natin Paul
    Title:   President

**Schedule A**

Initial Officers

President:  Natin Paul

Vice President:  Sheena Paul